**STATE OF MISSOURI, et al., Plaintiffs,**

v.

**Colonel William R. ANDREWS, Jr., et al., Defendants.**

**KANSAS CITY SOUTHERN RAILWAY CO., et al, Plaintiffs,**

v.

**Colonel William R. ANDREWS, Jr., et al., Defendants.**

**Nos. CV82–L–442, CV82–L–443.**

United States District Court, D. Nebraska.

May 3, 1984.

John D. Ashcroft, Atty. Gen., Curtis F. Thompson, Asst. Atty. Gen., Jefferson City, Mo., for State of Mo.

Thomas J. Miller, Atty. Gen., Elizabeth M. Osenbaugh, Asst. Atty. Gen., Des Moines, Iowa, for State of Iowa.

Paul L. Douglas, Atty. Gen., G. Roderic Anderson, Asst. Atty. Gen., Lincoln, Neb., for State of Neb.

Robert O. Wefald, Atty. Gen., Murray G. Sagsveen, Sp. Asst. Atty. Gen., Bismarck, N.D., for State of N.D., amicus curiae.

Mark V. Meierhenry, Atty. Gen., Daniel J. Doyle, Curtis Glen Wilson and Warren R. Neufeld, Asst. Attys. Gen., Pierre, S.D., for intervenor State of S.D.

Hogan & Hartson, James A. Hourihan and George U. Carneal, Washington, D.C., Marti, Dalton, Bruckner, O'Gara & Keating, P.C., M.J. Bruckner, Lincoln, Neb., for intervenor Energy Transp. Systems, Inc.

Jon T. Brown, Brenda H. Kelley, Stephen E. Roady, William B. Bonvillian, Brown, Roady, Bonvillian & Gold, Chartered, Washington, D.C., Knudsen, Berkheimer,

Richardson & Endacott, Rodney M. Confer, Lincoln, Neb., for plaintiffs.

Frederick S. Middleton, III, Sierra Club Legal Defense Fund, Washington, D.C., for Sierra Club.

Carol E. Dinkins, Asst. Atty. Gen., Fred R. Disheroom, Sp. Litigation Counsel, Dept. of Justice, Land & Natural Resources Div., Washington, D.C., Ronald D. Lahners, U.S. Atty., David A. Kubichek, Asst. U.S. Atty., Omaha, Neb., for federal defendants.

## MEMORANDUM ON MOTIONS TO DISMISS AND ON CROSS–MOTIONS FOR PARTIAL SUMMARY JUDGMENT

URBOM, Chief Judge.

This memorandum concerns the issue of the authority of the Secretary of the Interior to sign a contract with Energy Transportation Systems, Inc. (ETSI) which would allow ETSI to use water from Oahe Reservoir in a coal slurry pipeline. The complaints in both of these cases allege that the Secretary lacked authority to enter into the contract. The defendants have moved to dismiss these claims, and cross-motions for partial summary judgment also have been filed. Filings 57, 73, 93 and 143 in CV82–L–442 and filings 67, 70, 104 and 147 in CV82–L–443. The State of South Dakota, proceeding as amicus curiae, argues that the issue is irrelevant.

### I. General History

The authority of the Secretary of the Interior depends on an interpretation of the Flood Control Act of 1944, P.L. 78–534, 58 Stat. 887, the single most important subject of which was the Missouri River Basin. The lower basin suffered severe floods in 1942, 1943 and 1944. Flood Control: Hearings on H.R. 4485 before a Subcommittee of the Senate Committee on Commerce, 78th Cong., 2d Sess. (1944), at 659–663 (testimony of Col. Miles Reber) (hereinafter cited as 1944 Hearings); H.R.Doc. No. 475, 78th Cong.2d Sess. (1944), at 24–25. Residents of the lower basin pressured Congress for flood control, and residents of the upper basin wanted reservoirs for storage of water for irrigation.

The basin's development concerned two agencies—the War Department's Corps of Engineers [1], which was responsible for flood control and navigation throughout the country, and the Bureau of Reclamation of the Department of the Interior, which was organized to reclaim the arid lands of the nation's seventeen western states. These different responsibilities produced some conflict between the two agencies over where the dams would be built, who would build them, how the resulting reservoirs would be used, and who would control them. The Corps wanted as much empty storage space as possible to hold back flood waters and to use stored water during droughts to maintain the Missouri below Sioux City at a level high enough for navigation and sewage disposal. The Bureau wanted as much full storage space as possible for irrigation, especially during long droughts.

The Corps' plan for the basin, H.R.Doc. No. 475 (the Pick Plan) proposed building five dams on the main stem of the Missouri River below Fort Peck Reservoir in Montana, including six million acre-feet reservoirs at Oahe and Oak Creek in South Dakota. The dams were to be used for flood control, navigation, irrigation, and power production, while a number of very small flood control dams were to be built on the Missouri's tributaries. Id., at 28, 29.

The Bureau's report (the Sloan Plan) disagreed with the Pick Plan as to where the dams should be built, 1944 Hearings, at 516–518 (testimony of W.G. Sloan); Sen. Doc. No. 191, at 115–118, and as to the size of Oahe Dam. The Sloan Plan proposed a 19.6 million acre-feet Oahe Reservoir which would have flooded out the Oak Creek Dam and furnished water for irrigation of 750,-000 acres in South Dakota's James River Basin, navigation, and power production, as

---

**1.** In 1947, the Department of War became the Department of the Army. P.L. 80–253, § 205(a), 61 Stat. 495, 501. I shall use the two designations interchangeably.

well as flood control. Sen.Doc. No. 191, at 115.

Although the parties disagree on the seriousness of the conflict between the Corps and the Bureau, it is impossible and unnecessary to characterize accurately the agencies' relationship. No matter how bitter the dispute may have been, the agencies never disagreed over who was to build and control the main stem dams. The Pick Plan assigned those duties to the Corps of Engineers. H.R. Doc. No. 475, at 31. Maj. Gen. Reybold, the Chief of Engineers, told Bureau Commissioner H.W. Bashore that Corps' control of those dams was essential. Sen.Doc. No. 191, at 7. Bashore's formal commentary on the Pick Plan said that the main stem dams should be "constructed, operated, and maintained by the Corps of Engineers" because of "their peculiarly close relationship with flood control and navigation." H.R.Doc. No. 475, at 7; see, also, Letter of H.W. Bashore to the Secretary of the Interior, reprinted in Sen.Doc. No. 191, at 4. The Bureau's Board of Review recommended that the Corps operate all reservoirs where flood control and navigation dominated; it also recommended that the Bureau operate all "irrigation features" and that where a reservoir's irrigation function was minor compared with flood control, it should be operated "under regulations of the Bureau" as far as irrigation was concerned. Sen.Doc. No. 191, at 11.

During Senate committee hearings on the Flood Control Act, representatives of the Corps and the Bureau met to reconcile their differences. The resulting document was called the Pick-Sloan Plan, Sen.Doc. No. 247, 78th Cong., 2d Sess. (1944). Two parts of the plan are relevant here. First, it recommended the high Oahe dam proposed by the Bureau. *Id.*, at 3. The Corps had proposed low dams at Oahe and Oak Creek because it did not believe the ground at Oahe could provide a strong enough foundation for a high dam. When the Bureau's surveys reached the opposite conclusion, the Corps endorsed the high dam and said the extra storage should be used for irrigation, flood control, and navigation.

1944 Hearings, at 508, 518 (testimony of Col. Reber); at 518 (testimony of W.G. Sloan); at 594 (testimony of Rep. Case). The plan said that the high dam would supply water for irrigation in the James River Basin, flood control, navigation, and power production. Second, the Pick-Sloan Plan's only discussion regarding control was the following:

"3. It was possible to bring into agreement the plans of the Corps of Engineers and the Bureau of Reclamation by recognizing the following basic principles:

(a) The Corps of Engineers should have the responsibility for determining main stem reservoir capacities and capacities of tributary reservoirs for flood control.

(b) The Bureau of Reclamation should have the responsibility for determining the reservoir capacities on the main stem and tributaries of the Missouri River for irrigation, the probable extent of future irrigation, and the amount of stream depletion due to irrigation development.

(c) Both agencies recognize the importance of the fullest development of the potential hydroelectric power in the basin consistent with the other beneficial uses of water." Sen.Doc. No. 247, at 1

Ultimately, in § 9(a) of the Flood Control Act, Congress adopted the Pick and Sloans Plans "as revised and coordinated" by Sen. Doc. No. 247 and authorized construction by the Departments of War and the Interior. P.L. 78–534, § 9(a), 58 Stat. 887, 891. Section 9(b) of the Act expanded earlier flood control acts to include those works authorized in § 9(a) which were to be built by the War Department. Section 9(c) said that the developments to be undertaken by the Interior Department were to be governed by the federal reclamation laws. Although § 9 concerned only the Missouri River Basin, § 10 authorized construction projects throughout the country, which were to be built by the Corps. Sections 4 through 8 allocated control of all the projects authorized in the Act. Section 4 permitted the Secretary of War to build

and operate recreation facilities at reservoirs under his control; § 5 said that electricity generated at projects controlled by the War Department was to be turned over to the Interior Department for sale to the public; § 6 authorized the War Department to furnish water from Corps reservoirs for domestic and industrial use; § 7 required the War Department to prescribe regulations for the use of storage allocated at all federal dams for flood control and navigation; § 8 said that if the War Department determined that a dam it operated could be used for irrigation, the Secretary of the Interior was to build and control the works needed to distribute that water, under the provisions of the reclamation laws.

Pursuant to §§ 9(a) and 9(b), the Corps finished construction of the Oahe Dam in 1962. 128 Cong.Rec. S8479 (daily ed. July 16, 1982) Table II. The Corps always has operated and maintained all of the main stem dams and reservoirs on the Missouri. Letter of Col. C.A. Selleck, Jr. to E.R. Wilde, October 4, 1978, filing 337 in CV82-L-442, Administrative Record Document No. 900399; 1975 Memorandum of Understanding between the Secretary of the Interior and the Secretary of the Army, February 24, 1975, Admin.Rec.Doc. No. 900072, reprinted in Missouri River Basin Industrial Water Marketing: Hearings before Senate Committee on Interior and Industrial Affairs, 94th Cong., 1st Sess. (1975), Part 1, at 10–11 (hereinafter cited as 1975 Hearings). The Interior Department did not begin construction of the Oahe irrigation works described in the Sloan Plan until after 1968 and construction later was halted.

In response to the energy crisis of 1973 and 1974, the federal government began plans to develop the large deposits of coal, oil, and gas in eastern Montana and Wyoming. 128 Cong. Rec. S8482 (daily ed. July 16, 1982) (statement of Sen. Wallop). The government thought that the main stem reservoirs could supply the water needed for this development. Report of the Ad Hoc Committee on Water Marketing, July 1, 1974, Admin.Rec.Doc. No. 900336, at 5. The Bureau and the Corps agreed that one

million acre-feet of water could be made available each year for industrial use from the main stem reservoirs. 1975 Hearings, at 6. On February 24, 1975, the Secretary of the Army and the Secretary of the Interior signed a "Memorandum of Understanding" designed to expedite the use of water for energy development in the Missouri River Basin. Admin.Rec.Doc. No. 900072; 1975 Hearings, at 10–11. The memorandum said that the Interior Department would determine the amount of water available from the main stem reservoirs for irrigation and the extent to which that water would not be needed for irrigation; the Army then would determine how much of that excess water could be made available for industrial uses. Admin.Rec.Doc. No. 900072, at 1. The Secretary of the Interior was authorized then to contract for that water, on terms acceptable to it and the Army. *Id.* The memorandum was to last two years, *id.* at 2, but because of an extension, it did not expire until December 31, 1978. Letter from the Commissioner of the Bureau of Reclamation to the Assistant Secretary for Land and Water Resources, November 5, 1980, Admin.Rec.Doc. No. 900241, at 1. The Corps, in refusing to agree to another extension, pointed out that industrial water no longer was needed urgently and that the Interior Department had not executed a single contract for water delivery under the memorandum. Letter of Col. Selleck to E.R. Wilde, October 4, 1978, supra. However, the Interior Department later announced that it intended to contract unilaterally for service of up to one million acre-feet of water for industrial uses from the main stem dams. Admin. Rec.Doc. No. 900241, at 1.

ETSI had expressed interest in water from Oahe long before the memorandum of understanding had expired. On December 5, 1973, ETSI asked the Corps for permission to remove 75,000 acre-feet of water annually from Oahe for use in a coal slurry pipeline, 1975 Hearings, at 10, and on December 18, 1974, ETSI made a similar request to the Bureau, 1975 Hearings, at 9. On July 2, 1982, the Secretary of the Interi-

or and ETSI executed an "Industrial Water Service Contract." Admin.Rec.Doc. No. 900331. The contract said ETSI had received a conditional water permit from the South Dakota Conservancy District for an annual diversion of 50,000 acre-feet from Oahe Reservoir and that ETSI now sought the Interior Department's approval for diverting 20,000 of the acre-feet awarded by the conditional permit. Although the contract said that this decision had been reached "after consultation with the Secretary of the Army," it did not say whether the Army favored or opposed the contract. The contract was to last for forty years and said that the water was to be used in a coal slurry pipeline. At the time the contract was signed, neither the Army nor the Interior Department had executed any contracts for the use of water from the main stem reservoirs for irrigation purposes. 128 Cong.Rec. S8477 (daily ed. July 16, 1982) Table I, n. 3.

The issue now before me is whether the Secretary of the Interior had the authority to execute the ETSI contract. But before I address that issue I must consider South Dakota's amicus curiae briefs, which contend that the federal government cannot "sell" water but can only "contract for" water. Representatives of western states have resisted the former term, because they believe it implies that the United States owns the water. 90 Cong.Rec. 8231 (statement of Sen. Millikin), 128 Cong.Rec. S8482 (daily ed. July 16, 1982) (statement of Sen. Wallop); but see 90 Cong.Rec. 8231 (statements of Reps. Overton and White). Solely to avoid needless controversy, I shall avoid the term "sell." The existence of such a propriety interest is not in question here. South Dakota's assertion that it owns and absolutely controls the water in Oahe Reservoir ignores the federal government's interest in exercising some control over water, see *California v. United States*, 438 U.S. 645, 668, n. 21, 679, 98 S.Ct. 2985, 2997, n. 21, 3003, 57 L.Ed.2d 1018 (1978), the relation of navigable

streams to interstate commerce, the federal government's sizable investment in the construction and operation of Oahe Reservoir, and the Flood Control Act's express grants of authority to federal agencies in regard to dams built by the federal government. Because the United States has an interest in controlling Oahe Reservoir, South Dakota cannot successfully argue that the issue of which federal officials may exercise that control is irrelevant.

## II. Substantive Merits

### A.

██ The plaintiffs argue that nothing in the Flood Control Act permitted the Secretary of the Interior to sign the contract with ETSI. The defendants contend that § 9(c) of the Flood Control Act, coupled with § 9(c) of the Reclamation Project Act, P.L. 76–260, 53 Stat. 1187, 1194 (1939), authorized the Secretary's action. The contract itself says that it was authorized by those two sections. Admin.Rec.Doc. No. 900331, at 1. Section 9(c) of the Reclamation Project Act allows the Secretary of the Interior to enter contracts to furnish water for municipal or miscellaneous purposes[2], subject to certain repayment requirements. The Flood Control Act, after adopting the Pick, Sloan, and Pick-Sloan plans in § 9(a), says in § 9(c) that "the reclamation and power developments to be undertaken by the Secretary of the Interior under said plans shall be governed by the Federal Reclamation Laws," including the Reclamation Project Act of 1939. The defendants argue that § 9(c) of the Flood Control Act incorporates the Reclamation Project Act's provision which allows the Interior Department to furnish water for miscellaneous purposes from dams built under the Flood Control Act.

At least two courts have accepted this incorporation theory in regard to dams built by the Bureau of Reclamation. In *Environmental Defense Fund, Inc. v. Morton*, 420 F.Supp. 1037, 1040–1043 (U.S.

---

**2.** The parties disagree on whether a coal slurry pipeline is a miscellaneous use as contemplated by the Reclamation Project Act. My disposition of the authority issue makes resolution of this secondary question unnecessary.

D.C.Mont.1976), the court allowed the Bureau to furnish water for industrial purposes from the Yellowtail and Boysen Reservoirs, which the Bureau had built as reclamation developments under the Flood Control Act. The court's opinion said that "miscellaneous purposes" included industrial use, and pointed out that the department had told Congress that it was selling water from its Flood Control Act dams for such purposes and Congress had not halted the practice. The district court's ruling on this issue was affirmed on appeal, although other parts of the decision were reversed. *Environmental Defense Fund, Inc. v. Andrus,* 596 F.2d 848, 850 (C.A. 9th Cir.1979).

This holding, however, concerned only dams built by the Bureau of Reclamation. Although the defendants contend that the holding also applied to the Missouri River's main stem dams, the appellate court's statement of the controverted issues referred only to the Yellowtail and Boysen Reservoirs. *Id.,* at 850. The district court's opinion discussed only those two projects, which are in the Yellowstone Basin, and projects built in the Upper Missouri River Basin. 420 F.Supp. at 1041–1042. Neither basin contains the main stem dams built by the Corps. See Sen.Doc. No. 191, at 49–50, 53, 54–55. Furthermore, even an intentional reference to the main stem dams would have been dictum. As far as I know, no court has ever considered whether the Flood Control Act and the Reclamation Project Act should be read together to allow the Interior Department to furnish water for industrial purposes from a main stem reservoir such as Oahe.

B.

Three factors persuade me that Oahe Dam was not a reclamation or power development to be undertaken by the Secretary of the Interior pursuant to § 9(c) of the Flood Control Act but was built under § 9(b), which concerned projects to be built by the Corps.

First, Oahe Dam was built by the Corps, and the dam and reservoir always have been operated and maintained by the Corps. In 1944, the Corps and the Bureau agreed that the Corps was to build, operate, and maintain Oahe because of its importance to flood control and navigation. H.R.Doc. No. 475, at 7; Sen.Doc. No. 191, at 4, 7. Proponents of the Flood Control Act said the Corps should build and control those dams in the basin which were primarily for flood control and navigation, 90 Cong.Rec. 8315, 8625 (statements of Sen. Overton), 9282 (statement of Rep. Whittington). There is no dispute that the Corps built Oahe.

Even the Department of Interior has recognized repeatedly that Oahe is controlled by the Corps. In 1957, the department's assistant solicitor said that since his department had not built the main stem dams, it did not consider them reclamation developments and was not depositing revenues from their electrical production into the reclamation fund. Missouri Basin Water Problems: Joint Hearings before the Senate Committee on Interior and Insular Affairs and the Senate Committee on Public Works, 85th Cong. 1st Sess. (1957), Part 2, at 318, 319 (hereinafter cited as 1957 Hearings) (testimony of Edward Weinberg). A 1974 memorandum by the department's solicitor, upon which the department relied in asserting that it unilaterally could market Oahe's water, said that "the Corps has six dams and reservoirs on the Missouri River." Letter of the Solicitor to the Secretary of the Interior, November 27, 1974, at 2, Admin.Rec.Doc. No. 900065. The 1975 Memorandum of Understanding, signed by the Secretary of the Interior, says that the Army was to "retain all operational and managerial control" over the main stem reservoirs, Admin.Rec.Doc. No. 900072, at 1, and even the ETSI contract says that the Corps "constructed and is operating" Oahe. Admin.Rec.Doc. No. 900331, at 1. Except for the fact that the Bureau investigated the feasibility of erecting a high dam at Oahe by conducting surveys and exploratory drillings, see 1944 Hearings, at 508 (testimony of Col. Reber), and 517–518 (testimony of W.G. Sloan), the defendants have not pointed to any evidence that the Interior Department has assisted in the construc-

tion, operation, or maintenance of the Oahe Dam and Reservoir. All the evidence before me is that Oahe was undertaken by the Army, not by the Interior Department, and therefore is not covered by § 9(c).

The second factor is that Oahe's dominant purpose was flood control, and it has not been used for irrigation. The Sloan Plan said that Oahe should be used to irrigate 750,000 acres of land in the James River Basin of eastern South Dakota. Sen. Doc. No. 191, at 115–116. The Sloan Plan did not say who would build the necessary irrigation works or when they would be built. The Pick-Sloan plan said merely that Oahe was to "be developed in accordance with" the Sloan Plan. Sen.Doc. No. 247, at 6. The Corps finished the main dam in 1962, as I have said, but the Interior Department did not begin work on the irrigation works until sometime between 1968 and 1975. See Act of August 3, 1968, P.L. 90–453, 82 Stat. 624, 625; 1975 Hearings, at 9. Congress later authorized the Interior Department to cancel construction, WEB Rural Water Development Project Act of 1982, P.L. 97–273, § 3(a)(1) and § 4, 96 Stat. 1181, 1182, and South Dakota opposes any further construction, S.D.Cod.Laws Ann. § 46A–1–78 (1983). As of 1982, there were no contracts in effect for water diversions from the main stem dams by any private irrigators, 128 Cong.Rec. S8477 (daily ed. July 16, 1982), Table I, n. 3, and there is no evidence that any Oahe water ever has been used for irrigation or will be in the near future. Indeed, only two years ago, when Senator Patrick Moynihan asked Congress to declare that the federal reclamation laws applied to all the reservoirs which the Corps had built, he exempted all of the main stem Missouri projects—including Oahe—from the scope of his unsuccessful proposal. 128 Cong.Rec. S8475 (daily ed. July 16, 1982). From the evidence before me, I find no basis for my considering Oahe to be a reclamation development.

The defendants contend that there are several reasons to consider Oahe as a reclamation development. ETSI argues, first, that only a small part of the Oahe Reservoir is needed for flood control and naviga-

tion and a much larger part was allocated for irrigation. To support this ETSI cites Col. Reber's testimony that only twenty million of the sixty million acre-feet of storage in the main stem reservoirs is needed for flood control. But ETSI fails to provide any statistics which show that a majority of storage at Oahe—instead of the main stem reservoirs as a whole—is devoted to irrigation, and I do not know that any such statistics exist. The 1976 storage allocation for Oahe said that 5.5 million acre-feet was in "Inactive" storage, 1.1 million acre-feet exclusively for flood control, 3.2 million acre-feet for "Annual Flood Space and Multiple Use," and 13.7 million acre-feet for "Carryover Multiple Use." "Water for Energy: Missouri River Reservoirs Final Environmental Impact Statement," filing 202 in CV82–L–442, Exhibit 1, at 2–2, Table 2–1. The table lumps navigation, power, and irrigation storage together. Furthermore, Congress and the Bureau of Reclamation considered flood control and navigation to be Oahe's dominant purposes, regardless of how much storage space those uses require. See 1944 Hearings, at 611 (statement of Sen. Overton); 90 Cong. Rec. 8625 (statement of Sen. Overton) (Corps to build only flood dams whose primary purpose is flood control); H.R.Doc. No. 475, at 7 (letter of H.W. Bashore). See, also, 1944 Hearings, at 671 (statement of Col. Reber) (amount of storage needed for a particular use does not establish the priority of that use). And, even if Oahe was an irrigation development, it was not undertaken by the Interior Department.

ETSI also argues that most of the costs and benefits of developing the basin were attributable to irrigation. But ETSI's statistics are for the entire basin, so they include the many irrigation dams built on the Missouri River's tributaries. Actually, only 18.1 per cent of Oahe's cost was allocated to irrigation. 128 Cong.Rec. S8479 (daily ed. July 16, 1982) Table II.

The defendants also contend that Oahe is a reclamation development undertaken by the Interior Department because the Pick-Sloan Plan and the Flood Control Act gave

the Bureau and the Corps joint and coordinate jurisdiction over the main stem dams, with control allocated by function, pointing out that the Act's legislative history repeatedly says that the Interior Department is to regulate irrigation storage in reservoirs built by the Corps. They also observe that the Pick-Sloan Plan's sole discussion of control says that the Bureau should determine the main stem reservoirs' capacity for irrigation. Sen.Doc. No. 247, at 1. Col. Reber's testimony indicates that if the Corps were to be allocated a specific amount of storage space for its purposes, while the Bureau were to receive specific space for irrigation, the two agencies could operate independently, 1944 Hearings, at 729, but he also said that divided control of a reservoir would be impractical. Rivers and Harbors Omnibus Bill: Hearings before a Subcommittee of the Senate Committee on Commerce, 78th Cong., 2d Sess. (1944), Part 1, at 1242.

I am persuaded that Congress did not intend to create joint and coordinate jurisdiction over each dam. The statements of congressmen, Secretary of the Interior Harold Ickes, and officials of his department show that the basin's development was to be coordinated by assigning construction, operation, and control of each dam to the agency with the dominant interest in the dam: the Corps would build flood control dams and the Bureau would build those dams intended primarily for irrigation; the Bureau's interest in the irrigation aspects of a flood control dam would be accommodated by letting the Bureau control the irrigation distribution system, not the water or storage space in the reservoir.

Although many people discussed the division of control over the main stem reservoirs, nobody said that the Bureau's level of control over certain water stored for irrigation in Corps-built dams was so complete that the Bureau could furnish that irrigation water for nonirrigation purposes —i.e., industrial or miscellaneous uses. Indeed, as I shall discuss later in more detail, Secretary Ickes expressly distinguished irrigation and industrial uses. 1944 Hearings, at 312. It also is significant that nobody said that the Bureau was to have complete control over a specific block of water which had been reserved for irrigation in a reservoir built by the Corps; the strongest support for that proposition is Rep. Whittington's statement that reclamation storage should "be under the supervision of the Interior Department." 90 Cong.Rec. 4127. In contrast, there were many statements which gave authority over flood control dams to the Corps of Engineers. The Bureau itself said that the main stem dams "should be constructed, operated and maintained by the Corps of Engineers." Letter of H.W. Bashore, H.R. Doc. No. 475, at 7. Senator Overton, the Flood Control Act's primary sponsor in the Senate, explained:

"Someone must have control of a dam. If it is a flood-control or navigation dam, the Secretary of War has charge of it, and if it is an irrigation dam, the Secretary of Interior has charge of it."

90 Cong.Rec. 8315. See, also, 90 Cong.Rec. 8245 (statement of Sen. Overton). Senator O'Mahoney said:

"The flood-control policy envisaged the construction of vast new works which would store great amounts of water, over which the War Department and the Army engineers would have jurisdiction.... [S]o far as the War Department is concerned, it should have jurisdiction over those works which are to be constructed primarily for flood control, but if they store surplus water, such waters should be made available for any purpose...."

90 Cong.Rec. 8548. Neither senator qualified his statements or implied that the Interior Department had any authority over the water in reservoirs built by the Corps. Senator O'Mahoney did say that surplus water should be made available for any use, but he did not say that the Interior Department was to make it available.

The main support for the defendants comes from the statements of several congressmen that the Interior Department should prescribe regulations for irrigation

storage in reservoirs operated by the Corps. See 90 Cong.Rec. 4130 (statement of Rep. Curtis); 1944 Hearings, at 527 (statement of Maj. Gen. Reybold); 90 Cong. Rec. 4127 (statement of Rep. Whittington).

Section 6 of the House version of the Flood Control Act used the same language. Section 5 of the House bill applied the same language to a parallel situation and said that the War Department was to prescribe regulations for the use of flood control storage in all federal reservoirs. See 1944 Hearings, at 2.

However, Interior Secretary Ickes requested that Congress abandon that language. He said that § 6 of the House bill contained provisions which were "not entirely apt in their relation to the various technical features of the Federal reclamation laws" and he asked Congress to adopt a new section which said that when the Secretary of War determined that a new reservoir could be used for irrigation, the Secretary of Interior was authorized to "construct, operate, and maintain under the provisions of the Federal reclamation laws ... such additional works in connection therewith as he may deem necessary for irrigation purposes." 1944 Hearings, at 313. Congress adopted Ickes' proposal as § 8 of the final Flood Control Act.

The difference between the two sections is striking: the former allows regulations about storage; the latter permits construction and operation of irrigation works which are added to a Corps-operated reservoir. The focus shifts from water in the reservoir to water that has been removed from the reservoir. Furthermore, § 8 concerns only dams and reservoirs "operated under the direction of" the Army, indicating that the Army retains control of the water still in the reservoir.

It is significant that § 5 of the House bill, which required the War Department to prescribe regulations for flood control storage, was adopted without change as § 7 of the Flood Control Act. The implication that the authority to operate irrigation works and the authority to prescribe regulations are different is reinforced by the fact that the Department of the Army has prescribed regulations for the use of flood control storage at Bureau-built dams, 33 C.F.R. § 208.11, while, to my knowledge, the Code of Federal Regulations does not contain any Interior Department rules for the use of irrigation storage in reservoirs built by the Corps.

The defendants argue that Secretary Ickes would not have proposed new language that would have reduced his authority. This assumes that Ickes believed he enjoyed the authority which his successors now claim, but his statements on the subject are quite inconsistent with that assumption, as I shall explain later. Moreover, the purpose of his proposal was to clarify and affirm his authority to impose the new reclamation laws' acreage restrictions and repayment requirements on California landowners who were irregating with water from reservoirs built by the Corps. *United States v. Tulare Lake Canal Co.*, 535 F.2d 1093, 1106–1107 (C.A. 9th Cir.1976), cert. denied 429 U.S. 1121; 97 S.Ct. 1156, 51 L.Ed.2d 571 (1977). He did not need to control the irrigation storage to accomplish this purpose. Indeed, it is not clear that such control would have been helpful. His purpose was best accomplished by his new language, which said that water from Corps reservoirs could be used for irrigation only through irrigation works and distribution systems built by the Bureau under the reclamation laws, and his plan succeeded, see, e.g., 41 Op.Atty's Gen. 377 (1958); *Tulare Lake Canal Co.*, supra; 43 U.S.C. § 390*ll*(a)(2), although recently Congress has said that such restrictions do not apply in certain circumstances. 43 U.S.C. § 390*ll*(a).

My reading of Secretary Ickes' proposal, whereby the Secretary of War was to control the water in reservoirs built and operated by the Corps and the Secretary of the Interior was to control the additional irrigation works used to distribute the water, is consistent with a number of congressional remarks that the Interior Department was to control irrigation features or works. See, e.g., 1944 Hearings, at 457 (statement

of Secretary Ickes); 90 Cong.Rec. 9282 (statement of Rep. Whittington); 90 Cong. Rec. 8245, 8625 (statements of Sen. Overton). It is also consistent with § 8's requirement that the Secretary of War must determine that the reservoir can be used for irrigation before the Secretary of Interior can build any irrigation works. If the Interior Department already controlled certain water in the reservoir because the reservoir had been built for flood control, navigation and irrigation, why should be it required to seek the War Department's approval to use that water?

My interpretation is also consistent with the control scheme proposed by the Bureau's Board of Review in the Sloan Plan. Sen. Doc. No. 191, at 11. The board said that the Corps should operate all reservoirs where flood control and navigation dominated, while the Bureau should operate all "irrigation features." *Id.* "Irrigation features" must mean the irrigation works built by the Bureau after the Corps finished the main dam; interpreting the phrase to include stored water and water storage space would conflict with the board's express statement that the Corps was to operate all reservoirs where flood control was the dominant purpose. I note that the board's suggestion that the Bureau prescribe regulations for irrigation storage was rejected when Secretary Ickes' replacement language was adopted.

In short, the congressional proceedings show that Congress intended the Corps to build, operate, and control the main stem reservoirs, while the Bureau was to build, operate, and control the irrigation works and distributions systems attached to those reservoirs.

The second major part of the defendants' argument regarding control of water stored for irrigation in reservoirs built by the Corps is based on the premise that the main stem reservoirs, including Oahe, contain water that has been stored for irrigation purposes but which will not be used for irrigation in the near future. The argument seems to be that once water storage is reserved or allocated for irrigation, the Interior Department assumes and retains control of that space and the water within it. As I recall Secretary Ickes' comment that industrial uses of water are not considered to be reclamation or irrigation uses, 1944 Hearings, at 312, I find it curious that the Interior Department is arguing, in effect, that having obtained control of certain water because of the water's intended use for irrigation, it can abandon that use (in the sense that no Oahe water has ever been used for irrigation and the Department does not expect that any will be used for irrigation for some time) and then use that water for a nonirrigation purpose.

The defendants have not pointed to any evidence which would show that specific storage space in Oahe Reservoir was assigned to irrigation. Instead, Col. Reber testified that in a multiple-purpose dam, a single block of water is allocated for navigation, power production, and irrigation together, 1944 Hearings, at 729, and statistics on storage allocation show this was done at Oahe. See "Water for Energy," supra, at 2–2, Table 2–1; 128 Cong.Rec. at S8479–8480 (daily ed. July 16, 1982) Table II. Earlier I said that joint coordination over a reservoir was possible if separate storage space was alloted for each purpose, but there is no evidence that separate allocations were made at Oahe. I also note that the defendants' briefs, when discussing the water which the Interior Department allegedly controls, refer to different blocks of water. See ETSI brief of February 3, 1983, at 19 (one million acre-feet of water in the main stem reservoirs allotted for industrial use by the Bureau and Corps in 1975), and at 14 (indeterminate amount of water intended but never used for irrigating the James River Basin); federal defendants' brief of March 15, 1983 (indeterminate amount of water stored in the main stem reservoirs for irrigation); ETSI brief of December 2, 1983 (indeterminate amount of water reserved in Lake Oahe for irrigation purposes). These terms do not describe the same body of water, and one wonders how the Interior Department is to control what cannot be identified.

The more important point is that while Congress undoubtedly thought that some of Oahe's water would be used for irrigation, that intent and any allocation of storage space for irrigation purposes are material only to the extent that they show that Oahe is a reclamation or power development undertaken by the Secretary of the Interior. See § 9(c), Flood Control Act. The implied argument that the Interior Department's reservation of storage space for irrigation in a reservoir built by the Corps of Engineers can constitute a reclamation development undertaken by the Secretary of the Interior does not persuade me. The Secretary of the Army undertook and developed Oahe; his department built it, always has operated it, and always has maintained it. The Secretary of the Interior, at best, merely said that some of the space in the reservoir built and operated by the Army should be available for irrigation. I say "at best," because there is scant evidence that the Secretary of the Interior ever took any action in regard to Oahe. The Pick-Sloan Plan said that his department was to determine the capacity of the reservoir for irrigation, Sen.Doc. No. 247, at 1, but the defendants have not presented any evidence that this determination was ever made. Instead, in 1957, Congress was told that a committee comprised of representatives from seven states and seven federal agencies annually determined storage allocations for the upcoming year, and the Corps implemented those recommendations. 1957 Hearings, Part 1, at 131 (testimony of James R. Smith). Furthermore, as I earlier discussed, there is no evidence that a specific block of water was ever assigned solely for irrigation use. The only evidence that the Secretary of the Interior took any action in regard to Oahe is an unsupported assertion that he included capacity for municipal, industrial, and irrigation purposes in the main stem reservoirs. Letter of Solicitor to the Secretary of the Interior, November 27, 1974, Admin. Rec.Doc. No. 900065, at 4. I am not sure what, if anything, the Secretary of the Interior did in regard to reserving Oahe storage, but allocating space or determining reservoir capacity at a reservoir built, operated, and maintained by the Corps does not mean that the Interior Department undertook a reclamation development at Oahe.

The above discussion shows that the Corps, the Bureau, and Congress believed that § 9(c)'s reference to "reclamation and power developments undertaken by the Secretary of the Interior" meant the irrigation dams which the Bureau was to build on the Missouri River's tributaries, while § 9(b) encompassed the dams which the Army was to build, including Oahe.

C.

The text and purposes of §§ 5 through 8 of the Flood Control Act reinforce my belief that the Secretary of the Interior lacked authority to contract with ETSI.

It is clear that the Corps, the Bureau, and Congress believed that the Missouri River's water should not remain idle but should be put to the maximum possible use, including industrial uses, although the propriety of large industrial uses was not resolved. See 90 Cong.Rec. at 8547–8548. This does not mean that the Interior Department must be able to market unused irrigation water to industrial users. Section 6 of the Flood Control Act authorizes the Secretary of the Army to make contracts for the domestic and industrial use of surplus water available at reservoirs under his control. It does not give similar authority to the Secretary of the Interior, and its legislative history shows that its grant of authority to the Army is exclusive.

Section 6 (§ 4 of the House bill) was enacted because the financial requirements of then-existing law often prevented cities and factories from obtaining water from nearby dams built by the Corps. Section 6 solved this problem by allowing the Army to furnish water for domestic or industrial uses and to set the rates for such use. 90 Cong.Rec. 4126 (statement of Rep. Whittington). Shortly after his explanation, Rep. Whittington addressed § 6 of the House bill, which said that the Interior Department was to prescribe regulations

under the reclamation laws for the use of irrigation storage in Corps reservoirs. 90 Cong.Rec. 4127. This provision's reference to the reclamation laws was similar to § 9(c) of the Act as finally adopted, yet nobody suggested that the Interior Department could solve the problem by furnishing unused irrigation water. Instead, Rep. Whittington said that § 6 was needed so that "the Government" could provide water for domestic and industrial use, 90 Cong. Rec. 4197, implying that the Interior Department did not have sufficient authority. Rep. Whittington also said that § 6 would make the authority of the two departments comparable because it would give the Corps the power in reservoir districts that the Interior Department already had in reclamation districts, 90 Cong.Rec. 4134, which are associated with dams built by the Bureau, not by the Corps. Rep. Whittington's statement does not show, as the defendants claim it does, that the Interior Department could furnish industrial water from reservoirs controlled by the Corps.

Interior Secretary Ickes' discussion of § 6 (while it still was § 4 of the House bill) shows that he did not believe he could furnish unused irrigation water from Corps reservoirs for industrial use. He knew that the section gave that authority to the Army, but he did not ask Congress to amend the section to include the Interior Department nor did he claim that his department already had such authority; instead, he said that the section "does not involve reclamation but covers merely the sale of water for industrial purposes." 1944 Hearings, at 312. Rep. Curtis and Rep. Whittington also said that the section concerned industrial uses, while irrigation was addressed elsewhere. 90 Cong.Rec. 4133, 4197. These remarks show that industrial uses and irrigation were placed in two separate categories, and there is no indication that the categories ever could be

merged. There is no reason to believe that § 6's grant of authority to the Army was not an exclusive one.

Sections 5 and 7 of the Flood Control Act also support the plaintiffs' position. Section 5 says that electricity produced at reservoirs "under the control of the War Department" shall be delivered to the Secretary of the Interior, who then shall sell it.[3] Section 7 authorizes the Secretary of War to prescribe regulations for the use of storage allocated for flood control at all federal reservoirs. These explicit grants of authority show that when Congress wanted to give an agency control over a particular function of the main stem dams, it did so expressly and not by the implicit, indirect method upon which the defendants rely. The absence of an explicit grant of authority is even more important because Congress considered a wide range of proposals for allocating control: one rejected amendment would have given complete control to the Bureau, see 90 Cong.Rec. 8616–8618, 8626, while another would have let the Army control irrigation. *Id.*, at 8458–8550. When debate is so broad in scope and so detailed in nature, it is unlikely that matters were left for implication. I believe that Congress said what it meant and did not intend to leave anything regarding authority to implication.

D.

The defendants argue that I should defer to the Interior Secretary's decision to sign the ETSI contract because it is the decision of an administrative agency and because it is supported by the 1975 Memorandum of Understanding between his department and the Army and by a 1974 memorandum of the Interior Department's solicitor.

■ The 1975 memorandum does not support the Secretary's decision, but could be read to mean that the Secretary entered it because he believed that he could not act

---

**3.** The federal defendants argue that § 5 does not apply to Oahe. The argument does not show that Congress intended to make a single implicit grant of authority to one agency, in contrast to its many explicit grants. Furthermore, the defendants' position is unreasonable. See 90

Cong.Rec. 9282–9283 (statement of Rep. Whittington); 1957 Hearings, at 323–326 (statements of Sen. Case and Sen. Anderson), 341 (testimony of Edward Weinberg), and 366–371 (memorandum of Interior Department Solicitor).

unilaterally. I do not draw that inference, because the Secretary may have entered it for other reasons. Nor shall I defer to the 1974 memorandum, in which the department's solicitor said that the Flood Control Act and the Reclamation Projects Act, when read together, allow the Interior Department to contract with ETSI. Admin. Rec.Doc. No. 900065. The memorandum is just the solicitor's interpretation of several statutes; it does not employ any special technical expertise nor rely on any policy consideration. Therefore, it is entitled to little deference. *Texas Gas Corp. v. Shell Oil Co.,* 363 U.S. 263, 270, 80 S.Ct. 1122, 1126, 4 L.Ed.2d 1208 (1960); *Hi-Craft Clothing Co. v. National Labor Relations Board,* 660 F.2d 910, 914 (C.A. 3rd Cir. 1981). The memorandum and the Secretary's decision also attempt to expand the department's jurisdiction, and an agency may not decide the limits of its statutory power. *Social Security Board v. Nierotko,* 327 U.S. 358, 369, 66 S.Ct. 637, 643, 90 L.Ed. 718 (1946); *Office of Consumers' Counsel v. Federal Energy Regulatory Commission,* 655 F.2d 1132, 1142 (C.A.D. C.Cir.1980); *Hi-Craft Clothing Co.,* supra, at 916; *Office of Communication of the United Church of Christ v. Federal Communications Commission,* 707 F.2d 1413, 1422–1423 (C.A.D.C.Cir.1983). This is particularly true here, because the Interior Department is asserting control over reservoirs built and operated by the Army, which has disputed the Interior Department's authority to market water unilaterally. See Memorandum of Richard Kearney, Acting General Counsel of the Army, December 16, 1974, Admin.Rec.Doc. No. 900407, at 7, n. 1. When the chief attorneys for the two departments affected by a statute disagree, neither enjoys any deference.

 My reluctance to defer to the Secretary of the Interior is strengthened by the fact that the department did not assert such authority while Congress was considering the Flood Control Act but waited until 1974. *Federal Trade Commission v. Bunte Brothers, Inc.,* 312 U.S. 349, 351–352, 61 S.Ct. 580, 581–582, 85 L.Ed. 881 (1941); *Federal Trade Commission v. Miller,* 549 F.2d 452, 457 (C.A. 7th Cir.1977). Additionally, deference is not proper when the agency's decision is neither adequately articulated nor reasonable. *Obremski v. Office of Personnel Management,* 699 F.2d 1263, 1269 (C.A.D.C.Cir.1983). The only expressed basis for the Secretary's decision was the 1974 memorandum of his solicitor, but that memorandum neither mentions the fact that § 9(c) of the Flood Control Act only applies to reclamation developments undertaken by the Interior Department nor explains why Oahe satisfies that requirement.

E.

Two other matters remain. First, the parties attached their exhibits to their briefs instead of filing them with supporting affidavits. I have not relied on any such exhibits which were not photocopies of congressional material or documents contained in the administrative record.

Second, South Dakota, participating as amicus curiae, argues that the entire issue discussed in this memorandum is irrelevant, because the Army has delegated its authority to the Interior Department. It bases this argument on the fact that the Corps approved ETSI's request for permission to build an intake structure in Lake Oahe, which would be used to remove the water pursuant to the contract. As I understand it, the permit was granted pursuant to 33 U.S.C. § 403, whose purpose is to prevent private parties from building obstructions in navigable waters. *United States v. Logan and Craig Charter Service,* 676 F.2d 1216, 1218 (C.A. 8th Cir. 1982). I do not know that the Corps could have rejected the request merely because it believed that the Interior Department could not have authorized the withdrawal of the water which will require the intake structure. Furthermore, the extensive briefs of the defendants do not raise this issue, even though several were submitted after South Dakota's briefs. Given the defendants' ample opportunity in which to present evidence or to argue on this point, I shall not

delay my resolution of the pending motions.

The plaintiffs have shown that the Flood Control Act did not authorize the Secretary of the Interior to execute the ETSI contract, and I shall grant their requests for a permanent injunction barring the defendants from performing that contract.