787 F.2d 270
 The STATE OF MISSOURI, The State of Iowa and The State of
Nebraska, Appellees,
v.
Colonel William R. ANDREWS, Jr., District Engineer, Omaha
District, United States Army Corps of Engineers; Brigadier
General Mark J. Sisinyak, Division Engineer, Missouri River
Division, United States Army Corps of Engineers; Lieutenant
General J.K. Bratton, Chief of Engineers, United States Army
Corps of Engineers; John O. Marsh, Jr., Secretary of the
Army; Joseph B. Marcotte, Jr., Regional Director, Upper
Missouri Region, Bureau of Reclamation; Robert N.
Broadbent, Commissioner, Bureau of Reclamation; Garrey E.
Caruthers, Assistant Secretary of the Interior for Land and
Water Resources; and James G. Watt, Secretary of the
Interior, The Department of the Interior, Appellants.
KANSAS CITY SOUTHERN RAILWAY COMPANY, The Sierra Club, The
Nebraska Chapter of the Farmers Education and Cooperative
Union of America; The Rocky Mountain Chapter of the Farmers
Educational and Cooperative Union of America; and The Iowa
Chapter of the Farmers Educational and Cooperative Union of
America, Appellees,
v.
Colonel William R. ANDREWS, Jr., District Engineer, Omaha
District, United States Army Corps of Engineers; Brigadier
General Mark J. Sisinyak, Division Engineer, Missouri River
Division, United States Army Corps of Engineers, Omaha,
Nebraska; Lieutenant General J.K. Bratton, Chief of
Engineers, United States Army Corps of Engineers; John O.
Marsh, Jr., Secretary of the Army; Joseph B. Marcotte, Jr.,
Regional Director, Upper Missouri Region, Bureau of
Reclamation; Robert N. Broadbent, Commissioner, Bureau
of Reclamation; Maxwell T.L. Lifurance, Wyoming State
Director, Bureau of Land Management; Robert F. Buford,
Director, Bureau of Land Management; Garrey E. Caruthers,
Assistant Secretary of the Department of the Interior for
Land and Water Resources; James G. Watt, Secretary of the
United States Department of the Interior; Craig W. Rupp,
Regional Forester, Region II, (Rocky Mountain Region),
United States Forest Service; R. Max Peterson, Chief United
States Forest Service; John R. Block, Secretary of the
United States Department of Agriculture; Anne M. Gorsuch,
Administrator, Environmental Protection Agency, Appellants.
The STATE OF MISSOURI, The State of Iowa and The State of
Nebraska, Appellees,
v.
Colonel William R. ANDREWS, Jr., District Engineer, Omaha
District, United States Army Corps of Engineers; Brigadier
General Mark J. Sisinyak, Division Engineer, Missouri River
Division, United States Army Corps of Engineers; Lieutenant
General J.K. Bratton, Chief of Engineers, United States Army
Corps of Engineers; John O. Marsh, Jr., Secretary of the
Army; Joseph B. Marcotte, Jr., Regional Director, Upper
Missouri Region, Bureau of Reclamation; Robert N.
Broadbent, Commissioner, Bureau of Reclamation; Garrey E.
Caruthers, Assistant Secretary of the Interior for Land and
Water Resources; and James G. Watt, Secretary of the United
States Department of the Interior; Energy Transportation
Systems, Inc., Appellants.
KANSAS CITY SOUTHERN RAILWAY COMPANY, The Sierra Club, the
Nebraska Chapter of the Education and Cooperative Union of
America, The Rocky Mountain Chapter of the Farmers
Educational and Cooperative Union of America, and The Iowa
Chapter of the Farmers Educational and Cooperative Union of
America, Appellees.
v.
Colonel William R. ANDREWS, Jr., District Engineer, Omaha
District; United States Army Corps of Engineers; Brigadier
General Mark J. Sisinyak, Division Engineer, Missouri River
Division, United States Army Corps of Engineers, Omaha,
Nebraska; Lieutenant General J.K. Bratton, Chief of
Engineers, United States Army Corps of Engineers; John O.
Marsh, Jr., Secretary of the Army; Joseph B. Marcotte, Jr.,
Regional Director, Upper Missouri Region, Bureau of
Reclamation; Robert N. Broadbent, Commissioner, Bureau of
Reclamation; Maxwell T.L. Lifurance, Wyoming State
Director, Bureau of Land Management; Robert F. Buford,
Director, Bureau of Land Management; Garrey E. Caruthers,
Assistant Secretary of the Department of the Interior for
Land and Water Resources; James O. Watt, Secretary of the
United States Department of the Interior; Craig W. Rupp,
Regional Forester, Region II, (Rocky Mountain Region),
United States Forest Service, R. Max Peterson, Chief, United
States Forest Service; John R. Block, Secretary of the
United States Department of Agriculture; Anne M. Gorsuch,
Administrator, Environmental Protection Agency; Energy
Transportation Systems, Inc., Appellants.
The STATE OF MISSOURI and The State of Iowa, The State of
Nebraska, Appellant,
v.
Colonel William R. ANDREWS, Jr., District Engineer, Omaha
District, United States Army Corps of Engineers; Brigadier
General Mark J. Sisinyak, Division Engineer, Missouri River
Division, United States Army Corps of Engineers; Lieutenant
General J.K. Bratton, Chief of Engineers, United States Army
Corps of Engineers, John O. Marsh, Jr., Secretary of the
Army; Joseph B. Marcotte, Jr., Regional Director, Upper
Missouri Region, Bureau of Reclamation; Robert N.
Broadbent, Commissioner, Bureau of Reclamation; Garrey
E. Caruthers, Assistant Secretary of the Interior for Land
and Water Resources; and James G. Watt, Secretary of the
United States Department of the Interior, Appellees,
Energy Transportation Systems, Inc., Appellee.
The STATE OF MISSOURI and The State of Nebraska, The State of Iowa,
v.
Colonel William R. ANDREWS, Jr., District Engineer; Omaha
District, United States Army Corps of Engineers; Brigadier
General Mark J. Sisinyak, Division Engineer, Missouri River
Division, United States Army Corps of Engineers; Lieutenant
General J.K. Bratton, Chief of Engineers, United States Army
Corps of Engineers; John O. Marsh, Jr., Secretary of the
Army; Joseph B. Marcotte, Jr., Regional Director, Upper
Missouri Regional, Bureau of Reclamation; Robert N.
Broadbent, Commissioner Bureau of Reclamation; Garrey E.
Caruthers, Assistant Secretary of the Interior for Land and
Water Resources; and James G. Watt, Secretary of the United
States Department of the Interior, Appellees,
Energy Transportation Systems, Inc., Appellee.
The STATE OF MISSOURI, Appellant,
The State of Nebraska and The State of Iowa,
v.
Colonel William R. ANDREWS, Jr., District Engineer, Omaha
District, United States Army Corps of Engineers; Brigadier
General Mark J. Sisinyak, Division Engineer, Missouri River
Division, United States Army Corps of Engineers; Lieutenant
General J.K. Bratton, Chief of Engineers, United States Army
Corps of Engineers; John O. Marsh, Jr., Secretary of the
Army; Joseph B. Marcotte, Jr., Regional Director, Upper
Missouri Regional, Bureau of Reclamation; Robert N.
Broadbent, Commissioner, Bureau of Reclamation; Garrey E.
Caruthers, Assistant Secretary of the Interior for Land and
Water Resources; and James G. Watt, Secretary of the United
States Department of the Interior, Appellees,
Energy Transportation Systems, Inc., Appellee.
KANSAS CITY SOUTHERN RAILWAY COMPANY, Appellant,
The Sierra Club; The Nebraska Chapter of the Farmers
Educational and Cooperative Union of America; The Rocky
Mountain Chapter of the Farmers Educational and Cooperative
Union of America; The Iowa Chapter of the Farmers
Educational and Cooperative Union of America;
v.
Colonel William R. ANDREWS, Jr., District Engineer, Omaha
District, United States Army Corps of Engineers; Brigadier
General Mark J. Sisinyak, Division Engineer, Missouri River
Division, United States Army Corps of Engineers, Omaha
Nebraska; Lieutenant General J.K. Bratton, Chief of
Engineers, United States Army Corps of Engineers; John O.
Marsh, Jr., Secretary of the Army; Joseph B. Marcotte, Jr.,
Regional Director, Upper Missouri Region, Bureau of
Reclamation; Robert N. Broadbent, Commissioner, Bureau of
Reclamation; Maxwell T. L. Lifurance, Wyoming State
Director, Bureau of Land Management; Robert F. Buford,
Director, Bureau of Land Management; Garrey E. Carruthers,
Assistant Secretary of the Department of the Interior for
Land and Water Resources; James G. Watt, Secretary of the
United States Department of the Interior; Craig W. Rupp,
Regional Forester, Region II (Rocky Mountain Region), United
States Forest Service; R. Max Peterson, Chief, United
States Forest Service; John R. Block, Secretary of the
United States Department of Agriculture; Anne M. Gorsuch,
Administrator, Environmental Protection Agency; Energy
Transportation Systems, Inc., Appellees.
 Nos. 84-1674, 84-1675, 84-1719 to 84-1721 and 85-1593NE.
 United States Court of Appeals,
Eighth Circuit.
 Submitted Aug. 20, 1985.
Decided March 13, 1986.
As Modified March 13, 1986.
 
 Fred Disheroon, James A. Hourihan, Washington, D.C., for appellants.
 Elizabeth M. Osenbaugh, Des Moines, Iowa, and Stephen E. Roady, Washington, D.C., for appellees.
 Before JOHN R. GIBSON and FAGG, Circuit Judges, and BRIGHT, Senior Circuit Judge.
 JOHN R. GIBSON, Circuit Judge.
 
 
 1
 On July 2, 1982 the Department of the Interior and Energy Transportation Systems, Incorporated, (ETSI) executed an Industrial Water Service Contract authorizing ETSI to withdraw 20,000 acre-feet of water per year, for forty years, from the Oahe reservoir in South Dakota. The States of Missouri, Iowa, and Nebraska filed an action in federal district court to enjoin performance of the contract. They also sought a declaration that officers in the Department of the Interior, the Bureau of Reclamation, and the Department of the Army, had violated various federal statutes by their approval and execution of the ETSI contract. The district court[1] held that the Oahe dam and reservoir were not reclamation projects under the Flood Control Act of 1944 and, therefore, the Secretary of the Interior lacks the statutory authority to execute unilaterally a water service contract to provide water from the Oahe reservoir for industrial use. We affirm the court's judgment that the Secretary of the Interior lacked the authority to execute the ETSI contract.
 
 
 2
 Our decision makes it unnecessary that we decide many of the other issues presented by these appeals. Serious objections are raised with respect to the standing of Kansas City Southern Railway Co., the Sierra Club, and the Nebraska and Iowa Chapters of the National Farmers Union. All of these parties challenge primarily the authority of the Secretary of the Interior to unilaterally enter the ETSI contract. Since we decide this issue in the States' appeal, any further discussion would be superfluous and detailed consideration of the difficult standing issues is therefore unnecessary.
 
 
 3
 ETSI planned to transport water by pipeline from the Oahe reservoir in South Dakota to Wyoming where it would be mixed with locally-mined coal to form a coal slurry; the slurry would be transported, again by pipeline, for use in coal-fired steam-generating power plants. The water service contract recites that it was executed pursuant to section 9(c) of the Flood Control Act of 1944 (the Act), Pub.L. No. 78-534, 58 Stat. 887, reprinted in 1944 U.S.Code Cong.Serv. 887, 891. Joint Appendix (J.A.) at 412; and section 9(c) of the Reclamation Project Act of 1939, 43 U.S.C. Sec. 485h(c)(1982). The contract states that it had been reached "after consultation with the Secretary of the Army", but does not state whether the Army approved the contract. State of Missouri v. Colonel William Andrews, 586 F.Supp. 1268, 1272 (D.Neb.1984).
 
 
 4
 To appreciate the substantive issues involved in this case, a discussion of the history of the Missouri River Basin development plans is required. Missouri River Basin development necessarily implicated the interests of two federal agencies: the War Department[2] which, through its subdivision, the Army Corps of Engineers, was primarily responsible for flood control and navigation throughout the country; and the Department of the Interior which, through the Bureau of Reclamation, supervised the reclamation of arid lands throughout the seventeen western states.
 
 
 5
 Prompted by flood damage and a need for a controlled water supply on the Missouri River and its tributaries, both agencies undertook studies to develop the Basin. The Corps' plan, named for Colonel Pick who prepared the report, was formalized in Congress as House of Representatives Document No. 475, 78th Cong. 2d Sess. (1944). The Bureau's report, named the Sloan plan after its author, was formalized in Congress as Senate Document No. 191, 78th Cong. 2d Sess. (1944). The district court summarized the relevant contents of both plans:
 
 
 6
 The Corps' plan for the basin, H.R.Doc. No. 475 (the Pick Plan) proposed building five dams on the main stem of the Missouri River below Fort Peck Reservoir in Montana, including six million acre-feet reservoirs at Oahe and Oak Creek in South Dakota. The dams were to be used for flood control, navigation, irrigation, and power production, while a number of very small flood control dams were to be built on the Missouri's tributaries.
 
 
 7
 The Bureau's report (the Sloan Plan) disagreed with the Pick Plan as to where the dams should be built, * * * and as to the size of Oahe Dam. The Sloan Plan proposed a 19.6 million acre-feet Oahe Reservoir which would have flooded out the Oak Creek Dam and furnished water for irrigation of 750,000 acres in South Dakota's James River Basin, navigation, and power production, as well as flood control.
 
 
 8
 State of Missouri, 586 F.Supp. at 1269 (citations omitted).
 
 
 9
 A senate committee harmonized the Pick and Sloan plans, producing the joint Pick-Sloan plan which Congress adopted in section 9(a) of the 1944 Flood Control Act. Multiple use reservoirs were an integral part of the development plan. The introduction to the Pick-Sloan plan proposed the following allocation of functions in multiple use projects:
 
 
 10
 3. It was possible to bring into agreement the plans of the Corps of Engineers and the Bureau of Reclamation by recognizing the following basic principles:
 
 
 11
 (a) The Corps of Engineers should have the responsibility for determining main stem reservoir capacities and capacities of tributary reservoirs for flood control and navigation.
 
 
 12
 (b) The Bureau of Reclamation should have the responsibility for determining the reservoir capacities on the main stem and tributaries of the Missouri River for irrigation, the probable extent of future irrigation, and the amount of stream depletion due to irrigation development.
 
 
 13
 (c) Both agencies recognize the importance of the fullest development of the potential hydroelectric power in the basin consistent with the other beneficial uses of water.
 
 
 14
 S.Rep. No. 2471, 78th Cong. 2d Sess. (1944). This is the only place in the Pick-Sloan plan where control is discussed.
 
 
 15
 The Oahe reservoir in South Dakota was one of the main-stem reservoirs constructed pursuant to the Pick-Sloan plan. The Sloan plan's specifications for Oahe were adopted in the Pick-Sloan plan and the dam was built and operated by the Corps of Engineers.
 
 
 16
 During 1973 and 1974, the federal government began plans to develop coal and mineral deposits located in Eastern Montana and Wyoming. To expedite the use of water from the main-stem reservoirs in this process, the Army and the Department of the Interior entered a Memorandum of Understanding (MOU). Under the MOU, the Department of the Interior would determine the volume of water stored in the main-stem reservoirs which was not currently needed for irrigation. The Army would then determine the volume of that excess water available for industrial purposes. The Department of the Interior then could contract, on terms agreeable to the Army, for industrial uses of the available water. The MOU stressed cooperative action. Then Acting General Counsel to the Army, Richard Kearney, endorsed the MOU as an interim measure pending final resolution of the agencies' authority to contract for the sale of main-stem reservoir water for industrial purposes. He concluded, however, that the Secretary of the Interior[3] did not have the authority to unilaterally market the water from these reservoirs for industrial purposes. Memoranda For The Chief, Office of Civil Functions, Dec. 16, 1974. J.A. at 170. The MOU expired December 31, 1978 and was not renewed. The ETSI contract was executed in 1982, after the MOU expired. The ETSI contract represents the first time that the Secretary of the Interior has attempted to unilaterally market water from a main-stem reservoir for industrial purposes.
 
 
 17
 To decide whether the Secretary of the Interior had authority to unilaterally execute the ETSI contract, the district court scrutinized the language and legislative history of the Act to determine how it delegated authority to the two federal agencies. The court concluded that the Secretary of the Interior lacked the authority to enter the contract and enjoined its performance.
 
 
 18
 The federal defendants and ETSI separately appeal this judgment. They argue, first, that the district court erroneously interpreted the authority delegated under the Act to the Secretary of the Interior and, second, that Congress has accepted the Secretary's interpretation of his powers under the Act. They also argue that the states do not have standing to assert these claims or, alternatively, that if the states do have standing then the matter becomes one within the exclusive jurisdiction of the United States Supreme Court.
 
 I.
 
 19
 Before discussing the substantive merits of this case, we address two threshold questions. The first is whether the states of Iowa, Nebraska, and Missouri have standing to assert the claims raised in the district court. The states' complaint alleged that the planned depletion of Missouri River Basin water threatens their right to obtain sufficient quantities of Missouri River water for such beneficial uses as production of hydro-electric power, transportation, and waste disposal. They also claimed that the planned depletion would injure fish and wildlife habitats. J.A. at 51. They further alleged that the federal appellants' conduct was the source of these threatened injuries and gave rise to causes of action under the following federal statutes: The Flood Control Act of 1944, 33 U.S.C. Secs. 701-1 to 709 (1982); The National Environmental Policy Act of 1969, 42 U.S.C. Secs. 4321-4347 (1982); Endangered Species Act of 1973, 16 U.S.C. Sec. 1531 (1982); The Reclamation Project Act of 1939, 43 U.S.C. Sec. 485(h) (1982); The Water Supply Act of 1958, 43 U.S.C. Sec. 390b (1982); The Administrative Procedure Act, 5 U.S.C. Sec. 706 (1982). The appellants argued that the reduction in Missouri River Basin water which the ETSI contract will cause is insignificant and will not work the injuries which the appellees allege.
 
 
 20
 The district court carefully analyzed each of the six counts in the states' complaint. It determined that, at least with respect to five of the six counts, the states had standing to assert the injuries alleged.[4] The court held that the states were members of the class of users of Missouri River Basin water whose interests are protected by section 708 of the Flood Control Act, 33 U.S.C. Sec. 708 (1982). State of Missouri v. Colonel William Andrews, No. CV 82-L-442, slip op. at 4 (D.Neb. Mar. 6, 1984). The court also found that the allegations of injury to fish, wildlife habitats, and sewage disposal stated a cause of action under the Fish and Wildlife Coordination Act, 16 U.S.C. Secs. 661, 1531. State of Missouri, slip op. at 4. Finally, the court held that the states had standing to invoke judicial review of the agencies' allegedly improper conduct under the Administrative Procedure Act, 5 U.S.C. Sec. 701 (1982).
 
 
 21
 To establish standing to assert their claims, the states must allege that the challenged administrative conduct has, or will cause them injury in fact, economic or otherwise, and that the injured interests arguably are within the zone of interest protected by the statutes invoked. See Sierra Club v. Morton, 405 U.S. 727, 733, 92 S.Ct. 1361, 1365, 31 L.Ed.2d 636 (1972); Association of Data Processing Service Organizations v. Camp, 397 U.S. 150, 152, 90 S.Ct. 827, 829, 25 L.Ed.2d 184 (1970); see also Churchill Truck Lines, Inc. v. United States, 533 F.2d 411, 416 (8th Cir.1976). We conclude that the states' allegations of injury to the beneficial uses of Missouri River Basin water, and to the fish and wildlife habitats which this water supports, meet the injury-in-fact requirement. The appellants' argument that this injury is not fairly traceable to their actions, nor likely to be redressed by our decision today, is unpersuasive.[5]
 
 
 22
 The appellants specifically challenge the district court's holding that the states are within the class of users whose interests are protected under section 6 of the Act, 33 U.S.C. Sec. 708 (1982). They argue that section 6 is intended only to protect prior holders of water rights, granted under state law, from appropriation by the federal government.[6] We do not think that this language must be read so narrowly. Section 6 of the Act evinces an intent to protect the interests of established users of Missouri River Basin water by ensuring that the Army considers their needs when determining whether there is surplus water available for industrial use. The states are current lawful users of Missouri River Basin water. The ETSI contract threatens their established interests. As such, we hold that the injuries alleged are within the zone of interests protected under the Act.[7] See, e.g., Granville House, Inc. v. Department of Health and Human Services, 715 F.2d 1292, 1299 (8th Cir.1983) (the prudential zone of interest test is satisfied if there is a sufficient nexus between the statutory purpose and the alleged injury.)
 
 
 23
 The second threshold question which we must decide is whether the Secretary of the Army joined in the execution of the ETSI contract. Only the Regional Director of the Bureau of Reclamation signed the contract for the government. However, it does recite that it was executed "after consultation with the Secretary of the Army." J.A. at 388. This court requested that the parties submit further information indicating whether the contract was jointly executed. In response, the federal appellants stated that "no action was taken by the Secretary of the Army under [the authority of section 6 of the Act]." Response of Federal Appellants to Courts Sept. 24, 1985 Order at 2.[8] The federal appellants went on to state, however, that the Secretary of the Army takes the position that the Secretary of the Interior acted within his authority when he executed the ETSI contract.[9] Id.
 
 
 24
 The federal appellants concede, therefore, that the Secretary of the Interior unilaterally executed the ETSI water service contract. That the current Secretary of the Army expressed a belief that the Secretary of the Interior had the authority to do so is irrelevant to the issue which we decide today: whether the Secretary of the Interior has the statutory authority to enter unilaterally into this contract. Having determined that the Secretary of the Army did not participate in execution of the ETSI contract, we now address this latter substantive issue.
 
 II.
 
 25
 The appellants challenge the district court's holding that Oahe is not a reclamation development and that, therefore, section 9(c) of the Act cannot be invoked as authority for the Secretary's execution of the ETSI contract. They point out that section 9 of the Act incorporates the Pick-Sloan plan and, specifically, the provision in the plan which grants the Secretary of the Interior authority to regulate those functions of a project concerned primarily with irrigation. Thus, they argue, section 9 of the Act grants the Secretary jurisdiction over irrigation storage in Missouri River Basin reservoirs. They then conclude that the Reclamation Development Act of 1939, incorporated by reference in section 9(c) of the Act, gives the Secretary the requisite industrial water marketing authority.[10]
 
 A.
 
 26
 Our analysis of this issue must begin with the language of the Act. Where the statutory language[11] is clear, it ordinarily is conclusive. United States v. Clark, 454 U.S. 555, 560, 102 S.Ct. 805, 809, 70 L.Ed.2d 768 (1982); TVA v. Hill, 437 U.S. 153, 184 n. 29 (1978); Sierra Club v. Clark, 755 F.2d 608, 615 n. 9 (8th Cir.1985). Section 9(a) of the Act provides that the comprehensive development plans set forth in Senate Document 247 (the Pick-Sloan plan) are approved by the Congress, and authorizes the Departments of the Interior and the Army to begin development of these projects. Section 9(b) of the Act provides that the 1938 Missouri River Basin plan is expanded to include those projects under the Pick-Sloan plan which the Secretary of War is authorized to undertake. Section 9(c) of the Act then provides that the federal reclamation laws will govern the reclamation and power developments undertaken by the Secretary of the Interior under the Pick-Sloan plan.
 
 
 27
 A straightforward reading of section 9(a)-(c) of the Act indicates that this section does not attempt to delegate authority on the basis of storage for a particular use within a given development. The focus is on the "general comprehensive plans" proposed in the Pick-Sloan plan.[12] It envisions that each department will develop the projects which it undertakes in accordance with the applicable law and, specifically, that the reclamation laws will govern projects undertaken by the Secretary of the Interior.
 
 
 28
 The inquiry in this case then is whether Lake Oahe is a reclamation development undertaken by the Secretary of the Interior pursuant to section 9(c) of the Act. From his comprehensive findings on this question, the essential thrust of which remains unchallenged in this appeal, Judge Urbom concluded that Oahe is not a reclamation development. To the extent that his conclusion is based on findings of fact, we do not find it clearly erroneous. Anderson v. City of Bessemer City, --- U.S. ----, 105 S.Ct. 1504, 1511, 84 L.Ed.2d 518 (1984). Further, we agree with the district court's interpretation of the Act which supports the conclusion that the Secretary of the Interior does not have the statutory authority which he seeks to exercise.
 
 
 29
 The district court offered three reasons for concluding that Oahe is not a reclamation development. First, the court found that Oahe was built by the Army Corps of Engineers and is, and always has been, maintained by it. State of Missouri, 586 F.Supp. at 1273. The appellants concede this point. They argue, however, that Oahe is in "a very basic sense" a reclamation development, ETSI Brief at 24, because it was built, in accordance with the Sloan plan, with a substantial capacity for irrigation storage, and because a substantial portion of its construction costs would be recovered under the repayment provisions of the reclamation laws. We are satisfied, as was the district court, that the existence of irrigation capacity in Oahe is insufficient to render it a reclamation development "undertaken by the Secretary of the Interior."
 
 
 30
 Second, the court found that Oahe's dominant purpose was flood control, and that it has not been used for irrigation purposes. Id. at 1274. The court noted that the Secretary of the Interior ceased construction of irrigation works to tap the reservoirs' capacity in 1982, and has never attempted to use it for irrigation. Id. The court also noted that there is no separate storage allocation for irrigation in the Oahe reservoir. Id. We think that these findings reasonably indicate that, even though Oahe has multiple use capability, there has been no significant reclamation development and hence no colorable argument that Oahe was undertaken by the Secretary of the Interior. As the district court noted, the Department of the Interior has itself, in the past, acknowledged this fact:
 
 
 31
 Even the Department of Interior has recognized repeatedly that Oahe is controlled by the Corps. In 1957, the department's assistant solicitor said that since his department had not built the main-stem dams, it did not consider them reclamation developments and was not depositing revenues from their electrical production into the reclamation fund. * * * A 1974 memorandum by the department's solicitor, upon which the department relied in asserting that it unilaterally could market Oahe's water, said that "the Corps has six dams and reservoirs on the Missouri River."
 
 
 32
 State of Missouri v. Colonel William Andrews, 586 F.Supp. at 1273 (citations omitted).
 
 
 33
 Finally, the district court determined that Congress did not intend to authorize coordinate jurisdiction over the Flood Control Act projects. The court stated:
 
 
 34
 I am persuaded that Congress did not intend to create joint and coordinate jurisdiction over each dam. The statements of congressmen, Secretary of the Interior Harold Ickes, and officials of his department show that the basin's development was to be coordinated by assigning construction, operation, and control of each dam to the agency with the dominant interest in the dam: the Corps would build flood control dams and the Bureau would build those dams intended primarily for irrigation; the Bureau's interest in the irrigation aspects of a flood control dam would be accommodated by letting the Bureau control the irrigation distribution system, not the water or storage space in the reservoir.
 
 
 35
 Id. at 1275 (Emphasis added) The legislative history supports the court's findings and the conclusion that each dam was undertaken and controlled by the agency with the dominant interest.[13]
 
 B.
 
 36
 The appellants argue that the district court's focus on the words "undertaken by" reads the Pick-Sloan division of authority out of the Act, and improperly narrows the scope of the Bureau's authority. They emphasize that section 3(a)[14] of the Pick-Sloan plan accords each agency jurisdiction over main-stem reservoirs on a functional basis: The Army to determine capacities for flood control and navigation, and the Interior to determine irrigation capacity. They urge us to conclude that section 9 incorporates this functional division of authority and, thus, that the Secretary's jurisdiction turns on whether there is irrigation storage allocation in a main-stem reservoir. Under this broad interpretation the full range of the reclamation laws, including the power to enter industrial water service contracts, is available to the Secretary where there is irrigation storage in a main-stem reservoir. The salient inquiry, in their opinion, is the availability of irrigation storage.[15]
 
 
 37
 We do not accept the argument that the district court's construction reads out of the Act the division of function set forth in the Pick-Sloan plan. The Pick-Sloan language to which the appellants refer accommodates the interest of each department in determining, in multiple use main-stem and tributary reservoirs, storage capacities for flood control and irrigation. Recognition of this accommodation does not do violence to the conclusion that a project, even though it entailed multiple use developments (most did), was undertaken--that is built, operated, and maintained--by the department within whose jurisdiction its primary use fell.[16] Section 9 of the Act simply adopts the projects proposed in the Pick-Sloan plan and directs that the reclamation laws apply to those undertaken by the Secretary of the Interior.
 
 
 38
 We also reject the appellants' contention that the district court impermissibly narrowed the Secretary's statutory authority by reading the statute to deny the Secretary of the Interior the authority to enter an industrial water service contract for water stored in an Army-controlled reservoir. We are convinced that other relevant provisions of the Act, as well as the legislative history of the Act, support the conclusion that the Secretary was never ceded the broad authority over irrigation storage in Army-controlled dams for which the appellants now argue.
 
 
 39
 Section 8 supports our determination that the Act does not grant the Secretary of the Interior plenary authority over irrigation storage in Army-controlled reservoirs. Section 8 allows the Secretary of the Interior, upon the Army's determination that any Army-controlled reservoir may be used for irrigation purposes, and upon specific authorization by the Congress, to construct, operate, and maintain "such additional works in connection therewith as he may deem necessary for irrigation purposes."[17] (Emphasis added.) The additional works must be built, operated, and maintained pursuant to the federal reclamation laws. The thrust of this provision is to make the reclamation laws applicable to irrigation benefits made available from irrigation works constructed in Army-controlled multiple-purpose reservoirs. The salient concern is to ensure that the details of the reclamation laws--addressing such matters as cost allocation and acreage limitations--apply to contracts for irrigation benefits from reservoirs undertaken by the Army.
 
 
 40
 Section 6 of the House Flood Control Bill, the counterpart to Section 8 of the Senate Bill, used significantly different language to accommodate the interest in having the Secretary administer irrigation works, under the federal reclamation laws, in Army-controlled reservoirs. It gave the Secretary of the Interior authority to prescribe regulations "for the use of the storage available for irrigation."[18] This language arguably encompassed a broader sphere of authority for the Secretary of the Interior, one more consonant with that for which he argues today.
 
 
 41
 In the Senate hearings on the Flood Control Bill, then Secretary of the Interior Harold Ickes proposed an amendment to section 6 to clarify that the reclamation laws were intended not merely to impose regulations, but to authorize "a system of contractual relationships." Hearings Before the Subcommittee on Flood Control, 78th Cong. 2d Sess. (1944). Secretary Ickes' proposed amendment was adopted as section 8 of the Act.
 
 
 42
 Secretary Ickes' amendment made two changes in the language of section 6 of the House Bill which are particularly significant to this dispute. First, it replaced the broad language dealing with regulation of "storage available for irrigation", with language authorizing the Secretary of the Interior to construct irrigation works under the provisions of the reclamation laws. Through this change the Secretary of the Interior attempted to make clear that the section governed irrigation works, including contracts for distribution of their benefits, not regulation of irrigation storage. Second, the amendment precisely states that the works authorized under section 8 of the Act are to be for irrigation purposes. By clearly emphasizing the boundaries within which the reclamation laws apply, the amendment carves out from what is otherwise an area of Army jurisdiction, a limited sphere of authority for the Secretary: the authority to administer, pursuant to the reclamation laws, irrigation works developed in Army-controlled dams.
 
 
 43
 This construction of section 8 belies the appellants' contention that section 9(c) of the Act already accorded the Secretary jurisdiction over irrigation storage in Army-controlled reservoirs. If, as appellants argue, all that is required for the reclamation laws to apply is the availability of irrigation storage, then section 8 of the Act is largely superfluous. One canon of statutory construction mandates that the provisions of a statute be construed to avoid redundancy. Conway County Farmers Association v. United States, 588 F.2d 592, 598 (8th Cir.1978). Our reading of the statute avoids rendering section 8 superfluous. Section 8 clearly cannot be read as authorizing use of irrigation storage for industrial purposes and it supports our conclusion that section 9(c) divides authority on a functional, not a storage allocation basis.
 
 
 44
 Secretary Ickes recognized that this limited jurisdiction did not encompass the authority to unilaterally market water for industrial purposes. In a letter to the Senate committee considering the flood control bill, Secretary Ickes attempted to broaden his authority to encompass the power to dispose of surplus water in a reservoir which, pursuant to section 8 of the Act, is utilized for irrigation purposes, for domestic or industrial purposes. He attempted to accomplish this through a proviso to section 4 of the House Bill, later enacted as section 6 of the Act,[19] and which grants the Secretary of the Army the authority to enter industrial water marketing contracts for surplus water stored in Army-controlled reservoirs. His arguments are instructive:
 
 
 45
 A proviso should, in my opinion, be added to section 4 of the bill in order to assure that the disposition of water for domestic and industrial purposes, from reservoirs serving irrigation purposes as well, shall consistently with the irrigation provisions of section 6 of the bill, be handled pursuant to the Federal reclamation laws. While it is true that section 4 does not involve reclamation but covers merely the sale of water for domestic and industrial uses, it is true also that, in those situations where the disposition of water for irrigation purposes will be accomplished under the Federal reclamation laws, the disposition of water for domestic and industrial purposes should be accomplished under the same statutes in order to achieve efficient and economical administration. The Federal reclamation laws contain provisions specifically designated to meet this situation. I suggest therefore that the following proviso be added * * * [to] the bill: "Provided. That the Federal reclamation laws shall govern the disposition for domestic or industrial uses of surplus water from any reservoir utilized for irrigation purposes pursuant to section 6 of this Act."
 
 
 46
 Senate Hearings on H.R. 4485, 78th Cong. 2d Sess., reprinted in 90 Cong.Rec. 9277, 9279 (1944) U.S.Code Cong.Serv. 1944, p. 1349 (emphasis added.) Secretary Ickes' proposal was not adopted. If we accept the construction of the statute which the Secretary of the Interior proposes, this proviso would be read into the Act, and expanded, to allow the Department of the Interior to market surplus irrigation storage for industrial purposes even where it has not taken the steps necessary under section 8 of the Act to bring this water under its regulations.[20]
 
 
 47
 We think it is persuasive that the Secretary of the Interior at the time the Act was passed, who participated significantly in the development of the Act, did not believe that this department had the authority which the appellants today assert.
 
 
 48
 The focus in section 8 on development of irrigation "works" also supports the conclusion that the Secretary of the Interior's authority in multiple use projects does not turn solely on the availability of irrigation storage. In this case, where Congress wanted to allow the Secretary jurisdiction over the irrigation developments in a reservoir undertaken by the Army, it required the Secretary to construct "additional works for irrigation purposes."[21]
 
 
 49
 Similarly, in two instances in which Congress intended to grant an agency control over water in storage, it did so clearly. Thus, section 6 of the Act authorized the Secretary of the Army to contract for domestic and industrial uses of surplus water available in any Army-controlled reservoir.[22] This provision limits the Secretary of the Army's ability to enter industrial water contracts by specifying that the rights of existing users must be preserved. The interpretation appellants urge would lead us to imply a similar right to the Secretary of the Interior. It seems incongruous, however, to hold that, in a statutory scheme which attempts to demarcate the jurisdiction of agencies with potentially competing interests, Congress would authorize both agencies to contract for water from the same pool for industrial purposes.[23] We do not believe that the statute or its legislative history supports this conclusion.
 
 
 50
 Again, in section 7 of the Act, Congress authorized the Secretary of the Army to "prescribe regulations for the use of storage allocated for flood control or navigation at all reservoirs constructed wholly or in part with Federal funds * * *." Pub.L. No. 78-534, 58 Stat. 887, reprinted in 1944 U.S.Code Cong.Serv. 887, 891 (emphasis added). It is amply apparent that where Congress intended to cede jurisdiction over water held in storage it did so clearly. Section 7 also indicates that Congress understood the distinction between projects "undertaken" by a particular department and those which merely have multiple-use capacities. Thus, section 7 grants the Army jurisdiction over all flood control storage--regardless of which agency undertook its development.[24]
 
 
 51
 Based on our review of the Act and its legislative history, we conclude that the district court correctly held that the Secretary of the Interior does not have the statutory authority to unilaterally execute the ETSI contract. The Act provides a delicate balance of authority between two departments with over-lapping, and somewhat conflicting interests. The dissent's concern appears to be that the Department of the Army will not adequately represent the competing interests of upstream and downstream users. Our role in interpretation of the statute does not, however, extend to mediation of these competing interests. While a different scheme may promote more efficient or more desirable administration of the Oahe storage, it is beyond our power to determine how the respective jurisdictional boundaries ought to be drawn. On these matters we must defer to legislative prerogative. Neither the statute nor its legislative history indicates that Congress intended the Secretary of the Interior to have unilateral authority to use water stored in Army-controlled reservoirs for industrial purposes.
 
 III.
 
 52
 We now address the appellants' argument that the district court erred in its refusal to defer to the Secretary of the Interior's interpretation of the scope of his statutory authority. They argue that under Chevron U.S.A. v. Natural Resources Defense Council, 467 U.S. 837, 104 S.Ct. 2778, 81 L.Ed.2d 694 (1984), the court should defer to the Secretary's reasonable interpretation of his power under the Act. They also maintain that the Secretary asserted this authority in Senate hearings on Missouri River Basin water marketing. They urge that the fact that the Senate recommended no action to change or clarify the law in response to this assertion of authority indicates Congressional acquiescence on this point.
 
 
 53
 In Chevron the Supreme Court stated that courts must accord considerable weight to an agency's construction of the statutory scheme which it is entrusted to administer if "this [agency's interpretation] represents a reasonable accommodation of conflicting policies that were committed to the agency's care by the statute." Id., 104 S.Ct. at 2783 (quoting United States v. Shimer, 367 U.S. 374, 382, 81 S.Ct. 1554, 1560, 6 L.Ed.2d 908 (1961)). The Chevron rule requires deference only where an agency reasonably construes the applicable statute on a matter which is within its jurisdiction to decide. The limits of an administrative agency's statutory authority remains an issue suitable for judicial resolution. Harmon v. Brucker, 355 U.S. 579, 582, 78 S.Ct. 433, 435, 2 L.Ed.2d 503 (1958); Social Security Board v. Nierotko, 327 U.S. 358, 368, 66 S.Ct. 637, 642, 90 L.Ed. 718 (1946). "[T]he deference owed to an expert tribunal cannot be allowed to slip into a judicial inertia which results in the unauthorized assumption of major policy decisions properly made by congress. * * * [Courts] must not rubberstamp ... administrative decisions that they deem inconsistent with a statutory mandate or that frustrates the congressional policy underlying a statute." Bureau of Alcohol, Tobacco, and Firearms v. Federal Labor Relations Authority, 464 U.S. 89, 104 S.Ct. 439, 444, 78 L.Ed.2d 195 (1983). See also Granville House v. Dept. of Health, Education & Welfare, 715 F.2d 1292, 1296 (8th Cir.1983), rev'd. after remand, 772 F.2d 451 (1985); State of Nebraska v. Federal Labor Relations Authority, 705 F.2d 945, 948 (8th Cir.1983).
 
 
 54
 Our review of the Act and its legislative history convinces us that Congress did not intend to grant the Secretary of the Interior the authority to unilaterally contract for water stored in an Army reservoir. We therefore affirm the district court's holding that the Secretary of the Interior's assertion of this authority is beyond his statutory mandate and therefore not entitled to judicial deference.[25]
 
 
 55
 Finally, we do not interpret Congress' failure to amend the statute in response to the MOU as constituting tacit acquiescence in the existence of the Department of the Interior's unilateral authority to enter the ETSI contract. The Supreme Court has held that a congressional committee hearing which is not contemporaneous with the passage of the statute does not conclusively establish legislative intent. See SEC v. Sloan, 436 U.S. 103, 120-21, 98 S.Ct. 1702, 1712-13, 56 L.Ed.2d 148 (1978). In this case, while the MOU was discussed in the hearings, the basic issue under consideration was "whether the agreement between the two departments could preempt state water rights." Hearings Before the Subcommittee on Energy Research and Water Resources on the Sale of Water from the Upper Missouri River Basin by the Federal Government for the Development of Energy, 94th Cong. 1st Sess. 1 (1975) (opening Statement of Senator Abourezk). Senator Abourezk seriously questioned the legal authority for the marketing plan. The discussion in the record seems to target whether the legal authority rests with the states rather than the federal agencies. The Secretary of the Interior's authority in relation to the authority of the Secretary of the Army was not discussed. We think this record fails to show the degree of congressional approval necessary to override the intent of the 1944 Congress.
 
 
 56
 We affirm the district court's judgment.
 
 
 57
 BRIGHT, Senior Circuit Judge, dissenting.
 
 
 58
 I dissent.
 
 
 59
 By substituting its interpretation of the Flood Control Act for that of the Secretary of the Interior, the majority misconceives our limited role when reviewing an agency's construction of a statute that it administers. As the Supreme Court has repeatedly emphasized, "[a]n agency's construction of a statute it is charged with enforcing is entitled to deference if it is reasonable and not in conflict with the expressed intent of Congress." United States v. Riverside Bayview Homes, Inc., 106 S.Ct. 455, 461, 88 L.Ed.2d 419 (1985).[1] The Secretary of the Interior reasonably construed section 9(c) of the Flood Control Act to provide that federal reclamation law governs the administration of irrigation water stored in the Oahe Reservoir. I would therefore reverse the district court's contrary holding and decide the remaining issues presented in this appeal.
 
 
 60
 Section 9(c) of the Flood Control Act provides that "reclamation and power developments to be undertaken by the Secretary of the Interior * * * shall be governed by the Federal Reclamation Laws." The Secretary of the Interior interpreted "reclamation developments" within this provision to include irrigation water stored within multipurpose reservoirs operated by the Army Corps of Engineers on the Missouri River. The Secretary concluded that the applicable reclamation laws authorized him to market the irrigation water for industrial use.[2] Pursuant to section 9(c) and the reclamation laws, the Secretary executed contracts to supply ETSI with irrigation water held within the Oahe Reservoir, a multipurpose reservoir on the Missouri River operated by the Corps.
 
 
 61
 The thoroughness and consistency of an agency's reasoning are factors that bear upon the amount of deference to be given the agency's interpretation. See Federal Election Commission v. Democratic Senatorial Campaign Committee, 454 U.S. 27, 37, 102 S.Ct. 38, 44-45, 70 L.Ed.2d 23 (1981). The Secretary's interpretation of section 9(c) was first asserted by the Solicitor of the Interior Department in a 1974 opinion. In 1975, the Secretary of the Interior formally adopted the interpretation in a Memorandum of Understanding entered into with the Secretary of the Army. The Memorandum stated that the Secretary of the Interior could market excess irrigation water stored in the Army-controlled reservoirs on the main stem of the Missouri River. The parties informed a congressional subcommittee that the Secretary of the Interior gained such authority from the reclamation laws, which they contended applied to the stored irrigation water under section 9(c) of the Flood Control Act. Hearings on the Sale of Water from the Upper Missouri River Basin by the Federal Government for the Development of Energy, 94th Cong., 1st Sess. 1, 5 (1975). The Memorandum expired in 1978.[3]
 
 
 62
 Since 1975, therefore, the Secretary of the Interior has consistently interpreted "reclamation developments" within section 9(c) to include irrigation water stored in multipurpose reservoirs on the Missouri River. We must give great weight to this long-standing and thoroughly reasoned construction. Consequently, we review the Secretary's interpretation only to determine whether it reflects a reasonable construction of section 9(c) in light of the language, policies, and history of the Flood Control Act of 1944. Riverside Bayview Homes, 106 S.Ct. at 461-62.
 
 
 63
 The Secretary's interpretation certainly represents a permissible construction of the language of the Flood Control Act. The Act nowhere defines "reclamation developments" as used in section 9(c). Further, it does not explicitly delegate control over stored irrigation and reclamation water to either the Army or the Interior. Indeed, the Act never specifically mentions such water. The Act therefore fails to reveal any clear and unambiguous intention of Congress to exclude irrigation water from the meaning of "reclamation * * * developments to be undertaken by the Secretary of the Interior" in section 9(c).
 
 
 64
 Despite an inability to identify the precise meaning that Congress attached to "reclamation developments," the majority asserts that several provisions of the Act reflect Congress' definite intent to foreclose the Secretary's interpretation. These provisions, however, also can be read consistently with section 9(c) as construed by the Secretary. Language open to such varying interpretations cannot be said to reveal Congress' "clear and unambiguous" intent, as the majority contends.[4]
 
 
 65
 Not only the words but also the legislative history of the Act fall far short of showing any unambiguous congressional intent to bar the Secretary of the Interior from asserting jurisdiction over irrigation water stored in Army reservoirs. See Chemical Manufacturers Ass'n v. Natural Resources Defense Council, Inc., --- U.S. ----, 105 S.Ct. 1102, 1110, 84 L.Ed.2d 90 (1985) ("After examining the wording and legislative history of the statute, we agree with [the agencies] that the legislative history itself does not evince an unambiguous Congressional intention to forbid [the agencies' interpretation]."). Indeed, the evolution of the Flood Control Act strongly supports the interpretation of section 9(c) advanced by the Secretary of the Interior.
 
 
 66
 In the early forties, Congress requested the Army Corps of Engineers and the Interior's Bureau of Reclamation to develop plans for alleviating water problems facing the states in the Missouri River Basin. The Corps' study, the Pick Plan, focused primarily on reducing the flooding problems of the downstream states without depriving them of the Missouri's navigation benefits. See H.R.Doc. 475, 78th Cong., 2d Sess. (1944). In contrast, the Bureau of Reclamation's study, the Sloan Plan, directed most of its attention to guaranteeing a ready supply of irrigation water for the frequently drought-stricken states in the upper Missouri Basin. See S.Doc. 191, 78th Cong., 2d Sess. (1944).
 
 
 67
 Both plans ultimately advised Congress to authorize construction of a series of dams and reservoirs along the Missouri River and its tributaries. Because the Corps and the Bureau of Reclamation represented different interests, their plans differed in matters such as the placement and size of the projects. Both agencies agreed, however, that the reservoirs should be administered such to "contribute most significantly to the welfare and livelihood of the largest number of people." H.R.Doc. 475 at 7; see S.Doc. 191 at 10.
 
 
 68
 The agencies suggested that, to achieve the greatest benefits, the reservoirs should serve a number of purposes, including flood control, navigation, and irrigation. H.R.Doc. 475 at 7; S.Doc. 191 at 10. And to assure that both the upstream and downstream states would share in the reservoirs' benefits, the agencies proposed that the Secretaries of the Army and Interior share in the reservoirs' control.
 
 
 69
 Under this concept of coordinate jurisdiction, the agency with the dominant interest in the reservoir would control its daily operations. For example, the Army Corps would operate those reservoirs intended primarily for flood control and navigation. To the extent that the Secretary of the Interior also had an interest in the reservoirs, the regulations of the Secretary would govern the administration of that interest. Therefore, the Secretary's regulations would control the administration of irrigation water stored in all multipurpose reservoirs.[5]
 
 
 70
 Because the Pick and Sloan Plans differed in some respects, Congress directed that a committee representing both agencies prepare a report reconciling the differences. In the resulting "Pick-Sloan Compromise," the only provision discussing control of the reservoirs reiterated the need for shared jurisdiction between the agencies:
 
 
 71
 3. It was possible to bring into agreement the plans of the Corps of Engineers and the Bureau of Reclamation by recognizing the following basic principles:
 
 
 72
 (a) The Corps of Engineers should have the responsibility for determining main stem reservoir capacities and capacities of tributary reservoirs for flood control and navigation.
 
 
 73
 (b) The Bureau of Reclamation should have the responsibility for determining reservoir capacities on the main stem and tributaries of the Missouri River for irrigation, the probable extent of future irrigation, and the amount of stream depletion due to irrigation development.
 
 
 74
 S.Doc. 247, 78th Cong., 2d Sess. 1 (1944).
 
 
 75
 The Pick, Sloan, and Pick-Sloan Plans thus assumed that Interior regulations would govern irrigation water stored in multipurpose dams, and Army regulations would control water stored for flood control and navigation. Congress adopted the Pick and Sloan Plans, as reconciled in the Pick-Sloan Compromise, in section 9(a) of the Flood Control Act. Neither the Act nor its legislative history clearly rejects the plans' underlying assumption of coordinate jurisdiction. The Secretary could therefore reasonably conclude that "reclamation developments" within section 9(c) include irrigation water stored in the main stem reservoirs.[6]
 
 
 76
 As the Supreme Court recently observed, effectuating congressional intent will occasionally yield anomalies. Federal Reserve System v. Dimension Financial Corp., --- U.S. ----, 106 S.Ct. 681, 689 n. 7, 88 L.Ed.2d 691 (1986). Although nothing prohibits Congress from adopting unwise legislation, id., we must not assume that Congress did so unless compelled by a clear expression of congressional intent. The majority's interpretation of the Flood Control Act produces some very curious results. It leaves the irrigation water stored in the main stem reservoirs without a governing agency or law. See supra at 277 n. 4. Consequently, the irrigation water stored in the vast Oahe Reservoir will sit unused and useless.[7] The Department of the Interior, representative of the irrigation interests of the upper basin states, will have no voice in the administration of the excess irrigation water. Instead, the Army Corps of Engineers, whose primary interests are in flood control and navigation, the same primary interests as the downstream states, will unilaterally regulate water in the largest federal reservoir in the Missouri Basin--a reservoir located in an upstream state and designed with the anticipation that its major consumptive use would be irrigation. Surely Congress did not intend such incongruous consequences.
 
 
 77
 In the absence of a congressional directive to the contrary, we must defer to the Secretary's reasonable interpretation of section 9(c) of the Flood Control Act. See Chemical Manufacturers Ass'n v. Natural Resources Defense Council, Inc., 105 S.Ct. at 1112. This deference seems particularly apt here, where the Army Corps of Engineers asserts no objection to the actions taken by the Secretary of the Interior. We should uphold the Secretary's permissible construction, not indulge in judicial creativity by choosing between competing interpretations. I would therefore reverse the district court's ruling that reclamation law does not apply to the irrigation water stored in the Oahe Reservoir,[8] and address those remaining issues not decided by the majority because of its disposition of this appeal.
 
 
 
 [1]
 The Honorable Warren K. Urbom, Chief Judge, United States District Court for the District of Nebraska
 
 
 [2]
 Renamed the Department of the Army by section 205(a) of the Act, 61 Stat. 501 (1947). Referred to in this opinion as "the Army", or "Army"
 
 
 [3]
 Throughout this opinion we will refer to the Secretary of the Interior as such or as "the Secretary"
 
 
 [4]
 Count III of the states' complaint stated that "[t]he ETSI water service contract is void because it purports to provide water for a purpose that Congress did not authorize." J.A. at 83. The district court declined to rule on standing with respect to this count because the plaintiffs had failed to specify the source of this cause of action. State of Missouri, Slip op. at 4. Count V of the State's complaint was based in part on the Water Supply Act, 43 U.S.C. Sec. 390b(d). The court found that this section does not confer any rights on a specific group and therefore does not provide a private cause of action. Slip op. at 5. The court found, however, that review was available under the Administrative Procedure Act. Id
 The district court denied the states' standing to sue as parens patriae. Because we affirm the court's judgment that the states have standing to sue on their own behalf, we need not address their standing to sue as parens patriae.
 
 
 [5]
 The appellants also argue that the states have no standing because the alleged injuries cannot be redressed by a decision of this court. They point out that ETSI obtained its water rights from the State of South Dakota which is not a party to this action. The fact that South Dakota granted ETSI the natural flow rights does not deny the states standing to challenge the contract allowing ETSI to withdraw water from the federal reservoir. We point out that the relevant inquiry is whether a claim is likely to be redressed by a favorable decision. Larson v. Valente, 456 U.S. 228, 243 n. 15, 102 S.Ct. 1673, 1682 n. 15, 72 L.Ed.2d 33 (1982) (citing Simon v. Eastern Kentucky Welfare Rights Organization, 426 U.S. 26, 38, 96 S.Ct. 1917, 1924, 48 L.Ed.2d 450 (1976)). The district court found that the water service contract at issue provides that it will become void if the federal permits and approval are overturned. Slip op. at 3. The parties also agree that loss of the federal water service contract would effectively undermine ETSI's ability to undertake the planned coal slurry project. Brief for Federal Appellants at 20-21. The water service contract is a primary feature of the ETSI plan to use Missouri River Basin water stored in a federal reservoir as a transportation medium, and a sufficient causal connection exists between the contract and the threatened injury to the states
 Our decision in this case does not address the issue of South Dakota's right, as against other states and the federal government, to allocate waters within its borders. This issue was not presented to us and South Dakota is not a party to this case.
 We are aware that the State of South Dakota has filed an original action with the United States Supreme Court which raises these issues.
 
 
 [6]
 Section 6 provides:
 That the Secretary of War is authorized to make contracts with States, municipalities, private concerns, or individuals, at such prices and on such terms as he may deem reasonable, for domestic and industrial uses for surplus water that may be available at any reservoir under the control of the War Department: Provided, That no contracts for such water shall adversely affect then existing lawful uses of such water * * * * Pub.L. No. 78-534, 58 Stat. 887, reprinted in 1944 U.S.Code Cong.Serv. 887, 890 (emphasis added) as codified at 33 U.S.C. Sec. 708 (1982).
 
 
 [7]
 The appellants argue, alternatively, that if we grant the states standing to sue in this action, we must find that the suit is one between two or more states and dismiss the cause under the eleventh amendment, for lack of jurisdiction. They contend that since South Dakota granted ETSI a water right, South Dakota's right to allocate water within its boundaries is in question. We reject this characterization of the issue before the court. The states' complaint alleges violations of federal statutes and challenges the conduct of federal agencies. As such our decision deals solely with the validity of the federal appellants' conduct
 
 
 [8]
 The states had maintained throughout this case that the Secretary of the Interior had acted unilaterally. In their response to the court's request, they refer to their Statement of Material Facts As To Which There Is No Dispute, and the appellants' response thereto, which contains the following:
 
 
 [14]
 The Secretary of the Army has not approved or executed a Water Service Contract with ETSI for use of water from Oahe
 Response: Plaintiff's statement in Paragraph 14 is technically correct, but the Corps did give express approval for the ETSI project to construct a water intake structure in Lake Oahe.
 Response of Plaintiff-Appellees at 1. The appellees then point to the Findings of Fact entered by the Corps of Engineers' Omaha District Engineer when he issued the ETSI permit for construction of the water intake structure. The engineer stated:
 V.B. Section 6 of the Flood Control Act of 1944 (33 U.S.C. Sec. 708) by its terms pertains only to contracts for certain uses of surplus water contained in reservoirs under the control of the Department of the Army. Issuance of the permit under consideration in these findings, * * * would not constitute, or be tantamount to, such a contract.
 Response of Plaintiffs-Appellees to Order Dated Sept. 24, 1985, Exhibit 3 at 19 (Emphasis added). Together these statements support the conclusion that the Secretary acted unilaterally.
 
 
 [9]
 The federal appellants specified that the Secretary of the Interior followed all the steps set out in the Memorandum of Understanding. They noted further that the memorandum did not require separate written approval by the Department of the Army of water service contracts. Response of Federal Appellants at 1. However, since the Memorandum of Understanding had expired when the Interior entered the ETSI contract, and since, in any case, it endorsed a cooperative role for both agencies, it is irrelevant to the validity of the Secretary of the Interior's unilateral action. This remains a question to be decided by examining his statutory authority
 
 
 [10]
 Section 9(c) of the Reclamation Project Act of 1939, 43 U.S.C. Sec. 485h(c) (1982) provides:
 The Secretary is authorized to enter into contracts to furnish water for municipal water supply or miscellaneous purposes: Provided, That any such contract either (1) shall require repayment to the United States, over a period of not to exceed forty years from the year in which water is first delivered for the use of the contracting party, with interest not exceeding the rate of 3 1/2 per centum per annum if the Secretary determines an interest charge to be proper, of an appropriate share as determined by the Secretary of that part of the construction costs allocated by him to municipal water supply or other miscellaneous purposes; * * * *
 
 
 [11]
 The relevant portions of section 9, subsections 9(a)-(c), are set out below:
 Sec. 9.
 (a) The general comprehensive plans set forth in House Document 475 and Senate Document 191, Seventy-eighth Congress, second session, as revised and coordinated by Senate Document 247, Seventy-eighth Congress, second session, are hereby approved and the initial stages recommended are hereby authorized and shall be prosecuted by the War Department and the Department of the Interior as speedily as may be consistent with budgetary requirements.
 (b) The general comprehensive plan for flood control and other purposes in the Missouri River Basin approved by the Act of June 28, 1938, as modified by subsequent Acts, is hereby expanded to include the works referred to in paragraph (a) to be undertaken by the War Department; and said expanded plan shall be prosecuted under the direction of the Secretary of War and supervision of the Chief of Engineers.
 (c) Subject to the basin-wide findings and recommendations regarding the benefits, the allocations of costs and the repayments by water users, made in said House and Senate documents, the reclamation and power developments to be undertaken by the Secretary of the Interior under said plans shall be governed by the Federal Reclamation Laws (Act of June 17, 1902, 32 Stat. 388, and Acts amendatory thereof or supplementary thereto), except that irrigation of Indian trust and tribal lands, and repayment therefor, shall be in accordance with the laws relating to Indian lands.
 Pub.L. No. 78-534, 58 Stat. 887, reprinted in 1944 U.S.Code Cong.Serv. 887, 891.
 
 
 [12]
 Some of the developments proposed in the Pick-Sloan plan included projects in Garrison, North Dakota, and Oahe, Fort Randall, Big Bend and Gavins Point, South Dakota. Some of the specifications for these projects are itemized in the Pick-Sloan plan. J.A. at 442
 
 
 [13]
 In Senate discussion of the Act, Senator Overton concisely explained this development scheme:
 I endorse the statement made by the President of the United States. He undertakes to show a line of demarcation between reservoirs for reclamation and irrigation purposes and those built for flood control and navigation. One category is to be built by the Bureau of Reclamation, and the other by the Army engineers. * * *
 The projects in this bill are along the lines suggested by the President. * * * [T]here are no projects in this bill proposed to be constructed by the Army engineers in which the interests of flood control do not predominate, and in the rivers and harbors bill there are no projects in which the interests both of flood control and navigation are not the predominating and controlling factor.
 
 
 [90]
 Cong.Rec. 8625 (1944). Senator Mahoney, also discussing this division of authority, stated " * * * [I]t was the purpose to give to the [Department of the Army] jurisdiction over [Army] dams and improvements, and to the Bureau of Reclamation jurisdiction over those which were primarily to be used for reclamation * * *." 90 Cong.Rec. 8548 (1944)
 
 
 [14]
 See supra p. 275-76
 
 
 [15]
 While we reject appellants' arguments on other grounds, we note that they face another problem. The Oahe reservoir does not have a separate storage allocation for irrigation. Rather, there is a joint inactive storage for flood control, recreation, irrigation, municipal and industrial water, and power plants. Water for Energy, Missouri River Reservoirs Final Environmental Impact Statement, table 2-1 at P. 2-2. J.A. at 187
 
 
 [16]
 Both House and Senate discussions of the proposed Flood Control Act reflect the awareness that a given project undertaken by one department may entail some functional division of authority. Representative Curtis stated:
 The bill has a number of important features. This bill lays down the principle that all reservoirs constructed with Federal funds, which have storage space available for flood control, shall be operated under the regulations of the War Department. This is common sense. It is absolutely necessary if we are going to protect the property and the life of the people in the flooded areas. There must be a central agency operating the reservoirs. Likewise, this bill provides that whenever any reservoir is being operated by the War Department, it [sic] is found that there is available water for irrigating farm lands, that the Bureau of Reclamation, through the Secretary of the Interior, shall prescribe the rules and regulations for the operation of that part of the storage that is available for irrigation. In other words, it gives the Bureau of Reclamation jurisdiction over the irrigation features of the reservoirs and the distribution systems. I think this is sound and advisable. I am told by individuals in the Bureau of Reclamation that it is a definite gain for them and a step forward.
 
 
 [90]
 Cong.Rec. 4130 (1944) (emphasis added). Senator Overton's discussion of the jurisdictional question demonstrates a similar awareness:
 The testimony shows, I think rather conclusively, that the projects herein authorized to be constructed by the Army engineers are ones in which flood control predominates over irrigation. Of course, the Senate will understand that, insofar as irrigation is concerned, all surplus water which can be used for irrigation is turned over to the Department of the Interior, and the method of irrigation and the operation of the irrigation works are under the control of the Department of the Interior.
 
 
 [90]
 Cong.Rec. 8625 (1944) (emphasis added)
 Our recognition that a multiple purpose project may involve functional authority for both agencies does not concede appellants' argument that Congress intended to authorize coordinate jurisdiction. To arrive at the appellants conclusion, we must focus on the use of the words "reclamation features" above all other language in the record to conclude that authority was divided on the basis of storage. We believe that the language of the Act, and the predominant indications to the contrary in the record, directs otherwise. The opinions expressed above are reflected in the statutory scheme created, which ceded to the Secretary of the Interior the authority to build irrigation works in an Army undertaken reservoir to tap its irrigation capacities. We have no basis, however, to conclude that this authority extends, as is argued here, to use of irrigation storage for industrial purposes.
 
 
 [17]
 Section 8 provides in full:
 Sec. 8. Hereafter, whenever the Secretary of War determines, upon recommendation by the Secretary of the Interior that any dam and reservoir project operated under the direction of the Secretary of War may be utilized for irrigation purposes, the Secretary of the Interior is authorized to construct, operate, and maintain, under the provisions of the Federal reclamation laws (Act of June 17, 1902, 32 Stat. 388, and Acts amendatory thereof or supplementary thereto), such additional works in connection therewith as he may deem necessary for irrigation purposes. Such irrigation works may be undertaken only after a report and findings thereon have been made by the Secretary of the Interior as provided in said Federal reclamation laws and after subsequent specific authorization of the Congress by an authorization Act; and, within the limits of the water users' repayment ability such report may be predicated on the allocation to irrigation of an appropriate portion of the cost of structures and facilities used for irrigation and other purposes. Dams and reservoirs operated under the direction of the Secretary of War may be utilized hereafter for irrigation purposes only in conformity with the provisions of this section, but the foregoing requirement shall not prejudice lawful uses now existing: Provided, That this section shall not apply to any dam or reservoir heretofore constructed in whole or in part by the Army engineers, which provides conservation storage of water for irrigation purposes.
 Pub.L., No. 78-534, 58 Stat. 887, reprinted in 1944 U.S. Code Cong.Serv. 887, 891.
 
 
 [18]
 Section 6 provides:
 Hereafter, whenever in the opinion of the Secretary of War and the Chief of Engineers any dam and reservoir project operated under the direction of the Secretary can be consistently used for reclamation of arid lands, it shall be the duty of the Secretary of the Interior to prescribe regulations under existing reclamation law for the use of the storage available for such purpose, and the operation of any such project shall be in accordance with such regulations. Such rates, as the Secretary of the Interior may deem reasonable, shall be charged for the use of said storage; the moneys received to be deposited into the Treasury to the credit of miscellaneous receipts.
 H.Rep. No. 4485 (1944) U.S.Code Cong.Serv. 1944, p. 1349 (Emphasis added).
 
 
 [19]
 Section 6 is quoted in full supra at 278
 
 
 [20]
 Our reading of the statute does not, as the dissent suggests, leave the irrigation storage in Oahe without an agency to administer it. Under section 8 of the Act the Secretary of the Interior may, with the requisite approval, develop irrigation works to use this storage for irrigation purposes. In this case, however, we deal with the Secretary's authority to market this water for industrial purposes. The Secretary of the Army retains the authority, pursuant to section 6 of the Act, to use any surplus water in Army-controlled reservoirs for domestic or industrial purposes
 We are aware of the Army Acting General Counsel's statement in his memoranda on Missouri River Water Marketing that the Army could not, under section 6, market the excess storage water in the main-stem reservoirs as surplus. The premise for that statement, however, was that the water not being used for irrigation, flood control, or navigation purposes was, at that time, run through generators to produce hydroelectric power. Technically, therefore, the water was being put to a lawful use and was not "surplus." See Memorandum For The Chief, Office of Civil Functions, Dec. 16, 1974. J.A. at 170.
 
 
 [21]
 The appellants argue that the district court adopted an overly restrictive definition of "works." They rely on an opinion of the Attorney General, 41 Op. Att'y Gen. 377 (1958), which held that "works" should not be read to mean only actual developments undertaken. This opinion of the Attorney General stated that section 8 of the Act makes reclamation laws applicable for the disposition of irrigation benefits even if no additional works were constructed to make these benefits available. Id. at 395. In section 390ll of the 1982 amendments to the Reclamation Development Laws, Congress rejected this broad reading of the "works" requirement in section 8. The amendment limits the applicability of the reclamation laws under section 8 to (1) projects which have by federal statute explicitly been designated, made a part of, or integrated into, a Federal reclamation project; and (2) projects for which the Secretary of the Interior has provided project works for the control or conveyance of agricultural water supply for the lands involved. 43 U.S.C. Sec. 390ll (Supp.1984). We believe that this amendment limits applicability of reclamation laws to the disposition of irrigation benefits pursuant to the development of additional works
 Environmental Defense Fund, Inc. v. Andrus, 596 F.2d 848 (9th Cir.1979), which upheld the Secretary of the Interior's authority to enter industrial contracts for water held in reclamation development reservoirs, is likewise inapplicable to this case. The contracts executed in Andrus fell squarely within the Secretary of the Interior's authority as set forth in section 9(c) of the Act. The projects involved were "undertaken"--built, operated and maintained--by the Secretary of Interior and, therefore, the Secretary had the authority under section 9(c) of the Reclamation Development Act to enter industrial contracts for use of this water.
 
 
 [22]
 See supra p. 278
 
 
 [23]
 In discussing section 6 of the Act, Representative Withington noted in its favor that it gave the Secretary of the Army the industrial water marketing authority in reservoirs undertaken by the Army, which the Secretary of the Interior had in reclamation developments. 90 Cong.Rec. 4134 (1944). This attention to the careful balancing of authority in the different kinds of projects cautions against a casual decision by this court finding independent authority in both agencies to enter industrial water contracts from the same body of water
 
 
 [24]
 The statute does provide explicit exceptions to this broad grant of authority. See, Pub.L. No. 78-534, 58 Stat. 887, 890, reprinted in 1944 U.S. Code Cong.Serv. 887, 890
 
 
 [25]
 The dissent focuses on United States v. Bayview Homes, Inc., --- U.S. ----, 106 S.Ct. 455, 88 L.Ed.2d 419 (1985), in arguing that our analysis miscontrues the appellate court's role in reviewing an agency's construction of the statute it administers. There is no conflict between the Bayview standard and our analysis here. A careful review of that case reveals why the deference appropriate on those facts is inappropriate in our case
 In Bayview the court was required to determine whether the Army Corps of Engineers' regulations interpreting "navigable waters" to include wetlands was proper under the Clean Water Act, 33 U.S.C. Secs. 1251-1375. In determining that the agency's regulation deserved deference, the Court found (1) that Congress deliberately chose to define the waters covered by the Act broadly; (2) that in defining "navigable waters" to include wetlands, the Corps and the EPA employed their special technical expertise; and (3) that the scope of the Corps' jurisdiction over wetlands was specifically brought to Congress' attention and that Congress rejected measures to curb the Corps' jurisdiction. Bayview, 106 S.Ct. at 463-65.
 We deal in this case with a statute delineating the respective jurisdiction of potentially competing agencies. Further, unlike the definitional issue requiring special technical expertise which the Court addressed in Bayview, the solicitor of the Interior Department's opinion, on which the Secretary of the Interior relies in this case, was a legal conclusion based solely on his reading of the statutory language--a function courts are capable of performing. Nor is the solicitor's interpretation of the statute as conclusively accepted as the dissent suggests. The Army Acting General Counsel's opinion to the contrary belies such a conclusion. See supra p. 276. Further, while the Department of the Army currently accedes to the validity of the ETSI contract, their response seems colored more by the fact that the Secretary of the Interior adhered to the form of the now expired MOU, than on an interpretation of Interior's statutory authority.
 Finally, while the legislative history of the Act supports the conclusion that Congress intended to protect irrigation uses of Missouri River Basin Water, nowhere do we find support for the conclusion that this protection requires that the Secretary of the Interior have the power to market surplus irrigation storage in main-stem reservoirs for industrial purposes. Only a true exercise of judicial creativity would allow us to extrapolate from protection of irrigation interests to inclusion under the reclamation laws of industrial uses of main-stem surplus storage.
 
 
 [1]
 We must defer to an agency's reasonable interpretation even though it determines the agency's jurisdiction under the statute. See United States v. Riverside Bayview Homes, Inc., --- U.S. ----, 106 S.Ct. at 461-66, 88 L.Ed.2d 419 (1985)
 
 
 [2]
 The district court did not determine and we do not decide whether the Secretary correctly construed his powers under the reclamation laws. We consider only whether the Secretary reasonably concluded that the reclamation laws govern the administration of the stored irrigation water
 
 
 [3]
 The majority states that the Memorandum of Understanding has no relevancy in this action because it had expired when the Secretary executed the ETSI contract. See Majority Opinion at 279 n. 9. However, the Memorandum does show that the Secretary of the Interior has consistently interpreted section 9(c) of the Flood Control Act to require application of reclamation laws to irrigation water stored in the Army-controlled main stem reservoirs. To that extent, therefore, the Memorandum of Understanding has great relevance to our examination of the Secretary's authority to enter the ETSI contract
 
 
 [4]
 The majority, for example, finds great significance in Congress' specific delegation to the Army of control over water stored for flood control and navigation (section 7) and over surplus water not allocated for any use (section 6). See Majority Opinion at 285-286. The majority concludes that Congress would have also specifically granted the Secretary of the Interior jurisdiction over stored irrigation water had it intended the Secretary to exercise such control
 If we followed the majority's reasoning to its logical conclusion, no agency has jurisdiction over irrigation water stored in Army reservoirs because Congress did not expressly delegate such authority. Such a rigid and narrow reading of the Act finds little support in the Act's language and no support in its legislative history. An equally reasonable explanation for the lack of any specific delegation of jurisdiction to the Secretary of the Interior is that Congress believed that such jurisdiction was already sufficiently delegated in section 9(c). This explanation not only gives the Act internal symmetry and consistency, but also supports the interpretation of section 9(c) advanced by the Secretary of the Interior.
 
 
 [5]
 The Chief of Engineers summarized the mechanics of this shared jurisdiction in a letter accompanying the submission of the Pick Plan to Congress:
 Tributary reservoirs should, when advisable from the standpoint of basin-wide development, be constructed, operated, and maintained by the agency with the dominant interest under existing law. It is essential, however, that the main stem projects be built, operated, and maintained by the Corps of Engineers, and that utilization of storage reserved for flood control in all multiple-purpose reservoirs or tributaries be in accordance with regulations prescribed by the Secretary of War. * * * Conversely, utilization of storage reserved for irrigation in all multiple-purpose reservoirs should be in accordance with regulations prescribed by the Secretary of the Interior.
 H.R.Doc. 475 at 3-4.
 The Sloan Plan echoed this division of authority:
 All reservoirs where flood control and navigation are dominant should be operated by the Corps of Engineers, and where flood control and navigation functions are minor, the reservoir should be operated in accordance with regulations of the Corps so far as flood control and navigation are concerned. All irrigation features should be operated by the Bureau of Reclamation or its agents. All reservoirs in which irrigation, restoration of surface and ground waters, or powers is dominant, should be operated by the Bureau of Reclamation. Where these functions are minor, the reservoirs should be operated under regulations of the Bureau of Reclamation so far as such functions are concerned.
 S.Doc. 191 at 11. In a letter commenting on the Sloan Plan and accompanying its filing with Congress, the Army Corps again emphasized that "[i]n all reservoirs, utilization of storage for flood control should be in accordance with regulations prescribed by the Secretary of War and utilization of storage for irrigation should be in accordance with regulations prescribed by the Secretary of the Interior." Id. at 8.
 
 
 [6]
 The majority contends that Congress' failure to adopt two proposed provisions that specifically provided that reclamation law applied to irrigation water strongly suggests that Congress did not intend for such law to apply. Once again, however, Congress' failure to pass the legislation can be also construed consistently with the Secretary's position, and therefore hardly constitutes compelling evidence of its intent
 
 
 [7]
 An essential difference between the majority and the dissent centers on whether water allocated for irrigation, but not yet used for that purpose, becomes "surplus water" under the Army's control pursuant to section 6 of the Flood Control Act. Although the majority contends that the stored irrigation water constitutes "surplus water," Majority Opinion at 30 n. 20, the legislative history of section 6 indicates otherwise. The debates on section 6 indicate that Congress may have intended "surplus water" to include only water not allocated for other uses. See, e.g., 90 Cong.Rec. 4133. The water here in question from the Oahe Reservoir is allocated for irrigation, and therefore apparently does not constitute "surplus water" under the Army's control
 
 
 [8]
 The majority observes that an "additional problem" exists because no specific allocation has been made concerning the amount of irrigation water stored in the Oahe. Majority Opinion at 281 n. 15. The design of the reservoir as authorized by Congress, however, expressly stated that the Oahe Reservoir would contain water to irrigate 750,000 acres of land, as well as additional storage for flood control and other uses. See S.Doc. 247, 78th Cong., 2d Sess. 3 (1944) ("The Pick-Sloan Compromise") (codified at section 9(a) of the Flood Control Act of 1944). No party to this appeal contends that the 20,000 acre-feet of water per year included in the ETSI contract would even approach exhausting this allocation